**WALLING, Adm'r of Wage and Hour Division, v. BAY STATE DREDGING & CONTRACTING CO.**

No. 4007.

Circuit Court of Appeals, First Circuit.

May 9, 1945.

Archibald Cox, Associate Sol., of Washington, D. C. (Douglas B. Maggs, Sol., of Washington, D. C., George H. Foley, Jr., Regional Atty., of Boston, Mass., and Edward D. Friedman, Atty., United States Department of Labor, of Washington, D. C., of counsel), for appellant.

Herman Snyder, of Boston, Mass. (Bailen, Snyder & Vernaglia, of Boston, Mass., of counsel), for appellee.

Before MAHONEY and WOODBURY, Circuit Judges, and PETERS, District Judge.

PETERS, District Judge.

This is an appeal from a final judgment of the District Court dismissing a complaint filed by the Administrator of the Wage and Hour Division, United States Department of Labor, under the Fair Labor Standards Act of 1938, asking for an injunction restraining violations of the over-time and record-keeping provisions of the Act, §§ 15 (a) (2) and 15(a) (5), 29 U.S.C.A. § 215 (a) (2, 5).

The case turns upon the applicability of the Act to employees of the defendant engaged in operating dredges. It is conceded that these employees are engaged in commerce and that the minimum wage and over-time provisions of the Act are applicable to them, unless they are exempted by § 13(a) (3), 29 U.S.C.A. § 213(a) (3), which provides:

"Sec. 13(a). The provisions of sections 6 and 7 shall not apply with respect to * * * (3) any employee employed as a seaman * * *."

The facts were stipulated and found by the District Court as stipulated. Briefly summarized they are as follows:

A dredge, several of which were owned and used by the defendant, is a floating plant, adapted and equipped for digging up mud and other material from the bottom of shallow rivers, creeks and harbors, and dumping it in scows, by which it is taken away to the place of deposit. A hydraulic dredge, one of which is used by the defendant, operates differently. Instead of excavating by a bucket, the usual method, the mud is sucked up by means of a centrifugal pump apparatus and forced directly to shore through a pipe line. The dredge has no power of propulsion by itself, except that as the work progresses it can be edged forward a few feet at a time by swinging the bucket under water. When

See, also, 3 F.R.D. 241.

taken by a tug-boat to the site of a job, heavy beams are dropped to the bottom through casings, holding the dredge in position for the work. A dredging operation usually continues in one locality for several weeks. The dredge is equipped with an engine which operates the bucket and another engine which operates the spuds or beams for holding the dredge in position. The dredge usually has two decks, accommodations for cooking, eating and sleeping. The personnel on a dredge operated by the defendant consists of a captain, one operator, one mate, four deck-hands, one oiler, one fireman, a cook, a mess-boy and a watchman. When a job is being carried on at some distance from Boston, the location of the defendant, the entire complement live on board. When the job is carried on close to Boston many of the employees after work go ashore to living quarters there. A launch is used for the transportation of men who go ashore after the day's work is completed. The captain of the dredge, who is in general charge of the hiring and discharging of employees, and who supervises operations, is required to have knowledge of tidal and weather conditions while the dredge is in tow, and usually has some knowledge of navigation. When the dredge is being towed from the site of one operation to another the dredgemen, under the captain, perform certain duties similar to those performed by mariners on moving vessels. A whistle on the dredge is operated to signal the tug. Running lights are used, being placed on the top deck of the dredge. The oilers or engineers man the bilge pumps, fire pumps and circulating pumps when the dredge is in tow. The firemen, cooks and mess-boys perform the usual duties of such positions. The operator, who is in charge of the dredge under the captain, has charge of placing the dredge in position, moving it ahead or backwards by the use of the bucket when such motion is required. He runs the dredging machinery and its appurtenances. The mate is in charge of the deck-hands and of the loading of the scows and supervises the men on the dredge handling the lines which hold the scows alongside. The deck-hands handle the spuds, oil the equipment, assist the fireman, do repair work on the hoisting equipment, and such other work aboard the dredge as may be necessary.

The employees on the dredges in question have not been organized by the National Maritime Union nor are they required by the defendant to have seamen's ratings. The captain is not a licensed officer, nor are the dredges enrolled or licensed under the Federal law or inspected by any maritime authority.

The defendant treated all its dredgemen as seamen and considered that, as to them, it was exempt from the requirements of the wage and hour provisions of the Act. The District Court took the same view, basing its decision upon the reasoning in Bolan v. Bay State Dredging & Contracting Co., D.C., 48 F.Supp. 266, a case in which the dredge-workers brought suit against their employer, seeking to establish their right to coverage under the Act.

In support of the claim that dredgemen are seamen, as that word is used in the Act, it is pointed out that in many decisions construing other statutes, giving rights and remedies to seamen, that term has been held flexible enough to cover groups of employees whose work is not directly connected with navigation and transportation by water, including dredge-workers, and it is urged that a line of judicial decisions had given such a definite and unambiguous meaning to the word "seaman", as including such employees before the Fair Labor Standards Act was passed, that it must be presumed that Congress used the word in the light of its then understood breadth of meaning, and therefore intended to cover dredgemen under the term "seamen", and to exempt them from the operation of the wage and hour provisions of the Act.

The plaintiff asserts that it 's not necessary to rely on such presumption, as there is more direct and satisfactory evidence of the meaning of Congress in using the language in question in connection with its purpose in passing the legislation. He maintains that the legislative history of the Act, including the reasons for its passage, and the proper rules of construction to be used, compel the conclusion that Congress used the word "seaman" with its commonly accepted meaning, and did not intend that employees in the position of dredge-workers should be without the protection of the Act. With this contention we agree.

As ordinarily used, the word "seamen" would not include dredge-workers. Webster says that a seaman is "One whose occupation is to assist in the management of ships at sea; a mariner; a sailor."

Whether a worker is a seaman, as the term is commonly used, depends upon the character of his duties. If they are essentially maritime he is a seaman. Otherwise he remains a landsman.

The work these dredgemen were employed to do was not connected with voyages on the sea, except occasionally and incidentally, as they were taken from one job to another. Their work was essentially connected with excavation and not with navigation. When the material excavated was dumped on scows, brought alongside the dredge, navigation and transportation then began. The scow or bargemen are admitted to be seamen and have been so treated. The dredgemen, whose work is to dig up material from the earth and deposit it in the scows, for others to carry away, are not "employed as seamen". They operate a steam shovel, or what amounts to that, and are employed as operators of an excavating plant. They are not actually seamen, but, their work being carried on upon the water, they have sometimes been classified as "seamen" and held to be covered by that term when it has been used in statutes passed for the protection of maritime workers. When such a construction was consistent with the apparent intention of Congress in passing the law, the word "seamen" has been expanded to give workers who are not strictly seamen the benefit of remedial laws. If this Act had been passed for the benefit of seamen, and land workers were excepted, it might be that the expansion of the term "seamen" to include dredge-workers would be justified in the aid of its purpose. But the Act originated in a bill for the benefit and protection of workers in commerce generally, as set forth in its preamble, and anything cut out of its coverage is not in aid of the purpose of the legislation, but the reverse. Consequently, it is not only necessary to construe the exception strictly, but it is important to ascertain, if possible, whether or not, in this particular statute, Congress used the language "employed as a seaman" in any other than its commonly accepted meaning.

As was said by Judge Cardozo in Warner v. Goltra, 293 U.S. 155, 158, 55 S.Ct. 46, 48, 79 L.Ed. 254:

"What concerns us here and now is not the scope of the class of seamen at other times and in other contexts. Our concern is to define the meaning for the purpose of a particular statute which must be read in the light of the mischief to be corrected and the end to be attained."

The plaintiff has furnished us in his brief with some illuminating excerpts from the history of the legislation.

In the consideration of the bill before the Committee, when the bill made no exception of seamen or other transportation workers from its provisions, representatives of the chief labor organizations representing seamen, appeared before the committee and made a plea for the exemption of seamen from the legislation on the ground that their interest had already been protected by other legislation,—referring to the Merchant Marine Act of 1936, 46 U.S.C.A. § 1101 et seq.—and suggested that without some exception being made the bill would interfere with prior legislation. The Sailors Union of the Pacific wrote to the committee:

" * * * Our union does not like to see any further or additional legislation enacted to cover a group of workers already so well covered, which might tend to create some confusion in labor relations, which are now on the road to practical and successful operation.

"Therefore, I ask on behalf of the Sailors Union of the Pacific, that the bill be so written as to exclude the seamen from the operation of the provisions of the bill."

What the representatives of the Unions meant by "seamen" was made clear by what they said:

" * * * we feel that in a general interpretation of the whole bill that the way has been left open for the proposed Labor Standards Board to have jurisdiction over those classes of *workers who are engaged in transportation*. While this may not have an unfavorable effect upon the *workers engaged in transportation by water*, we feel that it may conflict with the laws now in effect regarding the jurisdiction of the government machinery now set up to handle these problems.

" * * * As this newly formed Maritime Commission has jurisdiction at present over seamen in regard to wages, working conditions, and manning scales on subsidized merchant ships, and as we have every faith in the ability and competency of the Commission to handle our affairs, we feel that for the present time that that jurisdiction should not be hampered or impaired by any legislation that would be conflicting."

The Union representative before the Committee urged that it would be unwise to have two boards with jurisdiction over the same group. This reason would apply to regular seamen and not to dredgemen, because the jurisdiction of the Maritime Commission did not extend over dredge-workers. The colloquy between the witness and Senator Black, chairman of the committee, shows that they agreed upon the expediency of the amendment and upon the reason. It is apparent that in the hearing both the witness and the member of the committee used the term "seamen" with its common meaning, referring solely to water transportation workers. (Joint hearings before Senate Committee on Education and Labor and House Committee on Labor, 75th Congress, 1st Session, pp. 545, 549).

It was explained by the Chairman of the Committee on the floor of the Senate that it was the purpose of the bill as amended to avoid conflict with other legislation regulating wages and hours. (81st Cong.Rec. 7875.)

The provisions of the Act regulating hours and wages were reasonably applicable to dredge-workers but not at all to mariners whose hours and conditions of work necessarily are in a special class.

■ It was the purpose of the Act to establish maximum hours and minimum wages for workers in interstate commerce. Dredge-workers are in that group. They can get the protection if left in. They lose it if left out. The reasons for excepting seamen do not apply to dredgemen. The purpose of Congress in the legislation would appear to be thwarted if dredge-workers should be classed as seamen. In view of the remedial purposes and broad scope of the Act it is encumbent upon one claiming under an exception to bring himself clearly within it.

"That it was the intention of Congress to include within the protection of the Fair Labor Standards Act of 1938, every employee engaged in commerce or in production for commerce within the broad scope of those activities expressed in the Act, is no longer open to doubt. Fleming v. Hawkeye Pearl Button Co., 8 Cir., 113 F.2d 52, 56; Bowie v. Gonzalez, 1 Cir., 117 F.2d 11, 16; Kirschbaum v. Walling, 316 U.S. 517, 62 S.Ct. 1116, 86 L.Ed. 1638; Warren-Bradshaw Drilling Co. v. Hall [317 U.S. 88], 63 S.Ct. 125, 87 L.Ed. 83 decided November 9, 1942. The Act is remedial and must be given a liberal construction in accordance with its obvious intent and purpose. 'We must assume that all employees in interstate commerce, so far as reasonably possible, should be made subject to the provisions of the Act.' Fleming v. Hawkeye Pearl Button Co., supra (113 F.2d 56). Those asserting in reference to any employee, an exemption under the Act, must establish the exemption as being both within the spirit and the letter of the statute. Bowie v. Gonzalez, supra. Since the statute is remedial, and by its terms includes every employer and every employee coming within the broad scope of its coverage, the section granting exemptions is to be construed strictly against those claiming them. Fleming v. Hawkeye Pearl Button Co., supra." Helena Glendale Ferry Co. v. Walling, Admr., 8 Cir., 132 F.2d 616, 619.

The Supreme Court has recently emphasized the necessity and importance of a strict construction of the exemptions in the Fair Labor Standards Act of 1938.

"The Fair Labor Standards Act was designed 'to extend the frontiers of social progress' by 'insuring to all our able-bodied working men and women a fair day's pay for a fair day's work.' Message of the President to Congress, May 24, 1934. Any exemption from such humanitarian and remedial legislation must therefore be narrowly construed, giving due regard to the plain meaning of statutory language and the intent of Congress. To extend an exemption to other than those plainly and unmistakably within its terms and spirit is to abuse the interpretative process and to frustrate the announced will of the people. We accordingly agree with the two courts below that the exemption contained in Section 13(a) (2) is inapplicable in this case and that the employees involved are entitled to the benefits of the wage and hour provisions of the Act." A. H. Phillips, Inc., Petr., v. Walling, Administrator, 65 S.Ct. 807, 808.

The argument that the word "seamen" at the time of the passage of the Act had acquired such a fixed and definite meaning, inclusive of dredge-workers, that Congress cannot be supposed to have used it in any other way, is not sufficiently supported to authorize rejection of the apparent intent of Congress in using the word. The cases called to our attention by the defendant must be considered in the light of the pronouncement by the Supreme Court above that the exemptions in this Act must not

be extended to other than those "plainly and unmistakably within its terms and spirit."

In the case of Ellis v. United States, 206 U.S. 246, 27 S.Ct. 600, 51 L.Ed. 1047, 11 Ann.Cas. 589, relied upon by the defendant, it was held that dredge-workers, digging a channel in Boston Harbor, were not laborers or mechanics and were not employed upon any of the public works of the United States within the meaning of the Act of August 1, 1892, c. 352, 27 Stat. 340, 40 U.S.C.A. § 321 et seq., relating to the "limitation of the hours of daily service of laborers and mechanics employed upon the public works of the United States and of the District of Columbia."

It was not held that the term "seamen" must include dredge-workers. It was only held that the latter were not laborers or mechanics within the meaning of that Act. The observation in the majority opinion that dredge-workers were seamen within the definition of an earlier statute, Rev. Stat. 4612, 46 U.S.C.A. § 713, must be read in connection with the limitation confining the definition to that statute, for the purpose of which "seamen" would include persons who otherwise would be deemed not to be seamen. Warner v. Goltra, supra.

As a matter of fact, Congress did not intend that the Act should be interpreted as it was in the Ellis case. Soon after that decision, Congress amended the statute so that it would apply to all persons performing "services similar to those of laborers and mechanics in connection with dredging or rock excavation in any river or harbor." This was done for the stated purpose of overturning the Ellis decision. (S. Rep. 1056, 63d Congress, 2nd Sess. p. 5. See also 45th Congress, Rec. 1952.)

The defendant cites numerous cases holding that dredge-workers are entitled to a maritime lien for wages. There is no question about that.

"The rule that dredges engaged in work in furtherance of navigation are vessels within the meaning of the maritime law, and as such are subject to maritime liens for wages and supplies furnished, is sustained by the overwhelming weight of authority." Butler v. Ellis, 4 Cir., 45 F.2d 951, 955, and numerous cases cited.

It is also settled that under the Merchant Marine Act of 1920, 46 U.S.C.A. § 688, a dredge-worker is a seaman within the purview of that Act and may recover damages for personal injuries. Kibadeaux v. Standard Dredging Co., 5 Cir., 81 F.2d 670. Certiorari denied 299 U.S. 549, 57 S.Ct. 12, 81 L.Ed. 404. And the scope of that remedial Act has been extended to include stevedores under the term "seamen". International Stevedoring Co. v. Haverty, 272 U.S. 50, 52, 47 S.Ct. 19, 71 L.Ed. 157. In the latter case the Court said:

"We cannot believe that Congress willingly would have allowed the protection to men engaged upon the same maritime duties to vary with the accident of their being employed by a stevedore rather than by the ship. The policy of the statute is directed to the safety of the men and to treating compensation for injuries to them as properly part of the cost of the business. * * * we are of opinion that a wider scope should be given to the words of the act, and that in this statute 'seamen' is to be taken to include stevedores employed in maritime work on navigable waters as the plaintiff was, whatever it might mean in laws of a different kind."

It has been held that bargemen are to be considered seamen under the exception in the Fair Labor Standards Act. Gale v. Union Bag & Paper Corporation, 5 Cir., 116 F.2d 27. Certiorari denied 313 U.S. 559, 61 S.Ct. 837, 85 L.Ed. 1519.

It has also been held that bargemen were not seamen under the exception in the Act. Anderson et al. v. Manhattan Lighterage Corporation, 2 Cir., 148 F.2d 971.

The line of demarcation between seamen and non-seamen is not distinctly drawn, and probably cannot be. It depends a good deal upon the facts in each case, especially upon the character of the work that is principally engaged in. In the Manhattan Lighterage case above referred to, the Court mentions that the cases cited to it holding that the worker is a seaman, "either show quite clearly that the greater proportion of the work performed was of a maritime character or refrain entirely from considering the question of the ratio of nautical to longshore duties."

One conclusion that can be safely drawn from the numerous cases is that the term "seamen", used in various Acts, as well as the term "members of the crew", used in the Longshoremen's Compensation Act, 33 U.S.C.A. § 901 et seq., are flexible terms, the meaning of which depends upon the circumstances in which they are used

352

and the purpose of the particular statute in which they occur.

As the word "seamen" has no established meaning to include dredge-workers, and as there is no reason to believe from the history and purpose of the legislation that the word "seamen" was used with any such enlarged meaning, and as a necessarily strict construction of the language used prevents enlarging the scope of the term beyond its usual boundaries, we conclude that these dredge-workers were not "employed as seamen" and are, therefore, covered by the Act.

The judgment of the District Court is reversed and the case is remanded to that court for further proceedings not inconsistent with this opinion.