# In the
# United States Court of Appeals
## For the Seventh Circuit
_____

No. 03-3624

JOHN H. HARKINS, *et al.*,

Plaintiffs-Appellants,

v.

RIVERBOAT SERVICES, INC.,

Defendant-Appellee.

_____

Appeal from the United States District Court for
the Northern District of Illinois, Eastern Division.
No. 99 C 0123—**William J. Hibbler**, *Judge*, and
**Morton Denlow**, *Magistrate Judge*.

_____

ARGUED SEPTEMBER 10, 2004—DECIDED OCTOBER 6, 2004

_____

Before FLAUM, *Chief Judge*, and BAUER and POSNER, *Circuit Judges*.

POSNER, *Circuit Judge*. The plaintiffs in this suit for overtime pay under the Fair Labor Standards Act are 21 former employees of the defendant, which employed them on a gambling boat; 14 of the 21 also claim that they were fired in retaliation for making overtime claims, which likewise is forbidden by the Act.

The boat's home port is East Chicago, Indiana, on Lake Michigan. Like a number of other states, Indiana permits

gambling only on "riverboats." Ind. Code § 4-33-9-1. This curiosity of American public policy has been well explained by William Blake Bennett, "Waterborne Woes: Legal Difficulties of Riverboat Gambling in Emerging Jurisdictions," *Nev. Lawyer*, Feb. 1985, p. 19:

> Riverboat gaming undoubtedly has been chosen by gaming interests as a means by which casino gaming could be made more politically acceptable, both because it is considered as a less intrusive means of operation within a community, and because of its potential benefits to maritime interests, especially in areas where the shipbuilding industry has been reeling from the effects of a depressed offshore oil industry and from cutbacks in military vessel construction. Riverboat gaming also conjures up romantic notions of the past along the Mississippi River, and has been touted to the public as a means by which to create jobs, attract tourists, provide for economic development and enhance tax revenues by a voluntary form of taxation, while still avoiding the perception of casinos as a permanent part of the fabric of a community.

The *Showboat Mardi Gras Casino*, on which the plaintiffs worked, is a real ship despite its outlandish name and is considered a "riverboat" though it plies Lake Michigan rather than a river. Built in Florida, it sailed from its birth-place to East Chicago under its own steam. The plaintiffs were members of the ship's "marine crew." That is, they were not waiters or croupiers, but instead were responsible for the operation of the ship or (as comprehended within that term) the safety of the ship's passengers. The casino itself is operated by Harrah's, which hired the defendant to staff and supervise the maritime aspect of this boat-casino hybrid. Most of the plaintiffs, however, were not directly involved in navigation or engine-room work, and indeed

spent much of their time doing the kind of housekeeping chores that they would have done in a casino that was on land—which, they argue, is what the *Showboat Mardi Gras Casino* really is, since it spends at least 90 percent of its time moored to a pier in East Chicago. This high incidence of maritime inactivity is due in part to the fact that the lake is too rough for the passengers' taste much of the year, but mainly, we imagine, to the passengers' not being much interested in sailing; they're interested in gambling and are happy to do it while the ship is moored, without having to risk becoming seasick. (It is hard to believe that weather or water conditions, though basically the only statutory excuses for allowing gambling while the boat is docked, Ind. Code § 4-33-9-2, prevent its sailing 90 percent of the time.) When the ship does sail, it is for short distances—indeed, without special permission by the state's gambling commission, a cruise may not exceed four hours, Ind. Code § 4-33-9-3—and so the crew never has to sleep over in the ship. Realistically, their life differs only slightly from that of ordinary casino workers. The Fair Labor Standards Act (FLSA) exempts from its overtime provisions persons employed as seamen. 29 U.S.C. § 213(b)(6). The plaintiffs argue that they are not seamen because they do not do the distinctive work of seamen and do not work on a real ship but on a kind of glorified houseboat.

The district court dismissed the overtime claims of 18 of the 21 plaintiffs because no written consents by them to join in this suit had been filed with the court before the statute of limitations expired. The case then went to jury on the overtime claims of the remaining three plaintiffs and on the retaliatory-discharge claims of the 14 plaintiffs who had made such claims. The jury awarded a verdict for the defendant on all the claims. All 21 plaintiffs appeal.

In a collective (or, as it is sometimes called, a representative) action under the FLSA, a named plaintiff sues "in be-

half of himself . . . and other employees similarly situated. No employee shall be a party plaintiff to any such action unless he gives his consent in writing to become such a party and such consent is filed in the court in which such action is brought." 29 U.S.C. § 216(b). (Compare class actions under Fed. R. Civ. P. 23(b)(3), in which the consent of class members is not required; instead they have a right to be notified of the class action and to opt out of it and seek their own remedies. Fed. R. Civ. P. 23(c)(2)(B).) The plaintiffs' counsel asks us to overlook the failure to comply with the statute. He argues that since all 18 were actually named as plaintiffs in the complaint and participated in discovery, their consent to be parties can be presumed and so the failure to file written consents for them was harmless, a mere failure to comply with a technicality.

The statute is unambiguous: if you haven't given your written consent to join the suit, or if you have but it hasn't been filed with the court, you're not a party. It makes no difference that you are named in the complaint, for you might have been named without your consent. The rule requiring written, filed consent is important because a party is bound by whatever judgment is eventually entered in the case, and if he is distrustful of the capacity of the "class" counsel to win a judgment he won't consent to join the suit. We are inclined to interpret the statute literally. No appellate decision does otherwise.

The importance of a strict interpretation is illustrated by this case. Eight years after the suit was filed, Mr. Rossiello, the class counsel, who has previously been sanctioned on more than one occasion for his conduct of litigation, *Dormeyer v. Comerica Bank-Illinois*, 226 F.3d 915, 916-17 (7th Cir. 2000) (per curiam); *Youker v. Schoenenberger*, 22 F.3d 163, 169 (7th Cir. 1994), has still not produced written consents from the 18. All, it is true, are named in the complaint as plaintiffs.

But some were added late, and some who appeared in the original complaint disappeared when the complaint was amended. Rossiello emphasizes that all the plaintiffs have been deposed, but this hardly indicates that they wanted to have their rights adjudicated in this proceeding or be represented by counsel chosen by other plaintiffs.

The special oddity of this suit is that had it not been designated in the complaint as a collective action—that is, an action on behalf not only of the named plaintiffs but also of others similarly situated to them—there would be no requirement of filed written consents. The requirement is applicable only to collective actions. That is why those of the 18 who complained that they were fired in retaliation for filing overtime claims remained parties to the retaliation claims; those claims had not been pleaded as collective actions. It now appears that Mr. Rossiello long ago abandoned any idea of suing on behalf of those employees of the defendant whom he did not add to the complaint. Had he made this intention clear—an intention to convert the collective action for overtime pay to an action on behalf only of the named plaintiffs—before the statute of limitations expired, he would not have lost 18 of his 21 plaintiffs. *Anderson v. Montgomery Ward & Co.*, 852 F.2d 1008, 1018 (7th Cir. 1988); *Allen v. Atlantic Richfield Co.*, 724 F.2d 1131, 1134-35 (5th Cir. 1984); *Morelock v. NCR Corp.*, 586 F.2d 1096, 1103 (5th Cir. 1978).

*Anderson* says that "the requirement that plaintiffs in a representative action file a written consent with the district court applies only to those parties who are not named as plaintiffs in the complaint." *Id.* at 1018-19. This statement, to which Mr. Rossiello clings with the strength of desperation, is the purest dictum. *Anderson* was a joint action—that is, a suit that is not a collective action because, although there are multiple plaintiffs, there is no claim for relief on behalf of

persons similarly situated to the named plaintiffs. The character of the suit in *Anderson* is apparent from the court's citation to *Allen v. Atlantic Richfield Co., supra,* and from the fact that the plaintiffs in *Anderson* had "hired a lawyer to file a complaint on their behalf" and had thus "clearly indicated their consent to suit," while in the present case the plaintiffs' consent to take their chances with lawyer Rossiello is precisely what is at issue. This suit was captioned as a representative action when first filed and, for reasons known only to Rossiello, was never converted to a joint action. So the 18 are out.

As for the overtime claims by the three plaintiffs for whom written consents were filed, and which are therefore properly before us, the contention is that the district court should have ruled as a matter of law that they were not seamen within the meaning of the seaman's exemption from the FLSA, 29 U.S.C. § 213(b)(6). The exemption is terse—"any employee employed as a seaman"—and has given rise to an extensive case law which contains however no case much like this one, no crisp formula, and little discussion of the purpose of the exemption. See, e.g., *Owens v. SeaRiver Maritime, Inc.,* 272 F.3d 698 (5th Cir. 2001); *Pacific Merchant Shipping Ass'n v. Aubry,* 918 F.2d 1409, 1412 (9th Cir. 1990); *Knudsen v. Lee & Simmons, Inc.,* 163 F.2d 95 (2d Cir. 1947); *Sternberg Dredging Co. v. Walling,* 158 F.2d 678 (8th Cir. 1947); *Walling v. Bay State Dredging & Contracting Co.,* 149 F.2d 346 (1st Cir. 1945). Only two points emerge with any clarity from the cases: the employee must do maritime-type work on a ship that is within the admiralty jurisdiction; and decisions interpreting the term "seaman" in other statutes do not necessarily control its meaning in the FLSA. *Martin v. Bedell,* 955 F.2d 1029, 1035-36 (5th Cir. 1992); *Donovan v. Nekton, Inc.,* 703 F.2d 1148, 1150-51 (9th Cir. 1983) (per curiam); cf. *Warner v. Goltra,* 293 U.S. 155, 162 (1934) (Cardozo, J.).

The exemption recognizes that at sea, with a normal life impossible, working more than 40 hours a week is an appropriate work norm, as distinct from the situation in most ordinary employments, where, because 40 hours is the norm, requiring the employer to pay time and a half for overtime encourages him to spread the work by hiring enough workers to minimize the need and resulting expense of overtime. *Secretary of Labor v. Lauritzen*, 835 F.2d 1529, 1543-44 (7th Cir. 1987); *Donovan v. Crisostomo*, 689 F.2d 869, 876 (9th Cir. 1982); *Mitchell v. Brandtjen & Kluge, Inc.*, 228 F.2d 291, 292-94 (1st Cir. 1955). Given the infrequency and limited duration of the *Showboat*'s cruises, the application of the exemption has far less urgency than in a case involving extended voyages. Yet it would be odd to think that the crew of a ferry or a tugboat or a sightseeing boat contains no seamen because such boats don't go on overnight voyages.

A consideration in probing the outer boundaries of the exemption is that admiralty law guarantees employment benefits to seamen that are not guaranteed by law to other workers. The doctrine of maintenance and cure obligates employers to provide room, board, and medical care to a seaman injured on the job, even if through no fault of the employer, *Lewis v. Lewis & Clark Marine, Inc.*, 531 U.S. 438, 440-41 (2001); *Greenwell v. Aztar Indiana Gaming Corp.*, 268 F.3d 486, 489 (7th Cir. 2001); *Wills v. Amerada Hess Corp.*, 379 F.3d 32, 52 (2d Cir. 2004), while the Jones Act extends the uniquely liberal employer-liability standard of the Federal Employers Liability Act to seamen. *Miles v. Apex Marine Corp.*, 498 U.S. 19, 23-24 (1990); *Greenwell v. Aztar Indiana Gaming Corp.*, *supra*, 268 F.3d at 489; *Wills v. Amerada Hess Corp.*, *supra*, 379 F.3d at 47 n. 8. The plaintiffs in our case do not "need" these special employment benefits because the conditions of employment in a floating but rarely sailing casino are remote from those of ordinary sea duty. But it is

conceded that they have them anyway, and maybe they should have to take the bitter with the sweet.

Or maybe not; for as we noted earlier, the classification of an employee as a seaman under one statute or admiralty doctrine does not necessarily require that he be so classified under another one which might have a different purpose. But when persons employed on a ship, even so atypical a one as an Indiana gambling boat, are classified as seamen for purposes of entitlement to the special employment benefits to which seamen, including therefore these plaintiffs, are entitled, a presumption arises that they are seamen under the FLSA as well. Recognition of this presumption has the incidental but not trivial advantage of making law a little simpler.

The presumption could probably be rebutted in a case in which a person employed on a ship was engaged in activities that had no maritime tincture whatever; an example would be a waiter employed on a cruise ship to serve meals to the passengers at regular hours. He might be exposed to some of the hazards inherent in working on a ship, and this might justify classifying him as a seaman for Jones Act and maintenance-and-cure purposes, since both the statute and the admiralty doctrine concern shipboard injuries. *Dole v. Petroleum Treaters, Inc.*, 876 F.2d 518, 522-23 (5th Cir. 1989). But in all other respects his working conditions might be identical to those of waiters in conventional landlocked restaurants. The presumption is not rebuttable on this ground in the present case, however, because none of the plaintiffs is a croupier, cashier, bouncer, dealer, waiter, or entertainer; all are (or so the jury could reasonably find) members of the ship's operating crew. See *Martin v. Bedell*, 955 F.2d at 1035-36 (5th Cir. 1992); *Worthington v. Icicle Seafoods, Inc.*, 774 F.2d 349, 353 (9th Cir. 1984), rev'd on other grounds, 475 U.S. 709 (1986); *Walling v. Keansburg Steamboat Co.*, 162 F.2d 405, 406-

08 (3d Cir. 1947). Recall the division of responsibilities between the defendant and Harrah's.

The plaintiffs remind us that the Department of Labor defines "seaman" as one who performs "service which is rendered primarily as an aid in the operation of [a] vessel as a means of transportation, provided he performs no substantial amount of work of a different character." 29 C.F.R. § 783.31. But this just means that the employee must be a (more or less) full-time member of the marine crew, that is, the crew that is responsible for operating the ship. A ship is a means of transportation, and even when it is docked the marine crew is responsible for its safe and efficient operation and maintenance—for keeping it afloat and clean, scraping the barnacles off its hull, keeping the engines in repair, preventing fires, etc. All this is maritime work, and the members of the ship's crew who do it, thus including the plaintiffs in this case as the jury found, are seamen even during the intervals in which the ship is moored. *Walling v. Keansburg Steamboat Co.*, *supra*, 162 F.2d at 406-08. We are disinclined to specify as a matter of law a minimum percentage of time, over some specified interval (per week? per year?), at which a ship must be at sea to trigger the seaman exemption. We have not been given enough information to enable us to do this, and we are worried that unless the percentage were set very low shipowners would be unable to predict whether their maritime workers would be classified as seamen for FLSA purposes. That would make it difficult for the employer to figure his costs.

We can ask the question this way: do the plaintiffs spend their time performing duties that are necessary to the operation of the *Showboat* because it is a ship or because it is a casino? See *Donovan v. Nekton, Inc.*, *supra*, 703 F.2d at 1150-51. A blackjack dealer does not become a seaman by virtue of leaving his job at Harrah's land-based casino and taking

a job at Harrah's riverboat casino, but likewise a helmsman does not cease to be a seaman because he transfers to a casino boat that spends most of its time moored. It was for the jury to decide whether the three plaintiffs whose overtime claims survived to trial were more like the helmsman than like the blackjack dealer.

The plaintiffs urge a number of errors in trial rulings. None is substantial, and there is no need to burden the opinion with a discussion of them.

AFFIRMED.

A true Copy:

Teste:

_____

*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*