LIPEZ, Circuit Judge,
concurring.
I agree with the majority that more factual development is needed before the merits of McLaughlin’s claim can be adjudicated. The district court erred in concluding otherwise. However, the district court granted the motion to dismiss in response to specific arguments made by Boston Harbor. Indeed, it said that it was granting the motion “substantially for the reasons advanced in the defendants’ papers.” I wish to explain why, in my view, those specific reasons did not justify the district court’s ruling.
I.
Boston Harbor made three arguments in the district court in support of its motion to dismiss. First, citing Walling v. Bay State Dredging Co., 149 F.2d 346 (1st Cir.1945), Boston Harbor argued that the FLSA’s legislative history showed that the term “seaman” referred “solely to water transportation workers.”[1] In Boston Har *54 bor’s view, McLaughlin’s duties as a so-called “deckhand” on a commuter ferry-make her a “water transportation worker” and thus not entitled to overtime pay. Second, Boston Harbor cited regulations issued by the Department of Labor on the scope and meaning of the seaman exemption. See 29 C.F.R. pt. 783 (“Application of the Fair Labor Standards Act to employees employed as seamen”). Boston Harbor claimed that those, regulations cited case law excluding from overtime pay “all personnel employed by the owner on board ferries.” See Walling v. Keansburg Steamboat Co., 162 F.2d 405 (3d Cir.1947); Helena Glendale Ferry Co. v. Walling, 132 F.2d 616 (8th Cir.1942). Boston Harbor noted, too, that the regulations say that “Congress intended to exempt ... only workers performing water transportation services.” 29 C.F.R. § 783.29(a). Third and finally, noting that it could not find any reported cases in which deckhands on commuter ferries were entitled to overtime pay under the FLSA, Boston Harbor interpreted that absence of case law as proof that McLaughlin’s claim was legally unprecedented and baseless. On appeal, Boston Harbor essentially renewed these arguments.
II.
As one can see from the summary of Boston Harbor’s arguments, they draw heavily on the FLSA’s legislative history and the Department of Labor’s regulations interpreting the scope and meaning of the seaman exemption. Therefore, before addressing Boston Harbor’s specific arguments, I wish to discuss briefly that legislative history and the Department’s regulations.
A. The Fair Labor Standards Act and the “seaman” exemption
An early draft of the bill that became the FLSA did not exclude seamen from its overtime provisions. Bay State Dredging, 149 F.2d at 349. The chief proponents of the exclusion were seamen themselves who asked Congress to be excluded — specifically, two seamen’s unions, the Sailors’ Union of the Pacific and the National Maritime Union. Professing themselves happy with the extensive regulatory scheme already in place for seamen, the unions feared unintended consequences of further Congressional tinkering.[2] For example, *55 the representative of the Sailors’ Union of the Pacific testified:
Our union does not like to see any further or additional legislation enacted to cover a group of workers already so well covered, which might tend to create some confusion in labor relations, which are now on the road to practical and successful operation. Therefore, I ask on behalf of the Sailors’ Union of the Pacific, that the bill be so written as to exclude the seamen from the operation of the provisions of the bill.
Joint hearings on S. 2475 and H.R. 7200 before the Sen. Comm. on Educ. and Labor and House Comm. on Labor, 75th Cong. 545 (quoted in Bay State Dredging, 149 F.2d at 349). Similarly, the National Maritime Union’s representative explained his understanding
that the way has been left open for the proposed Labor Standards Board [created by the FLSA] to have jurisdiction over those classes of workers who are engaged in transportation. While this may not have an unfavorable effect upon the workers engaged in transportation by water, we feel that it may conflict with the laws now in effect regarding the jurisdiction of the government machinery now set up to handle those problems.
.... [W]e feel that for the present time that the [U.S. Maritime Commission’s] jurisdiction should not be hampered or impaired by any legislation that would be conflicting.
Joint hearings on S. 2475 and H.R. 7200 before the Sen. Comm, on Educ. and Labor and House Comm, on Labor, 75th Cong. 545 (quoted in Bay State Dredging, 149 F.2d at 349).
This history suggests that Congress excluded seamen from the FLSA’s overtime protections not because of a substantive policy judgment about the wisdom of paying them overtime, but primarily for procedural reasons — i.e., to avoid jurisdictional conflict. “Seamen were exempted from operation of the Fair Labor Standards Act of 1938 so as to avoid conflict of jurisdiction and confusion of labor relations.” Ke-ansburg Steamboat Co., 162 F.2d at 408; see also Weaver v. Pittsburgh Steamship Co., 153 F.2d 597, 599-600 (6th Cir.1946) (“On the floor of the Senate it was explained by Senator Black[3] that, with respect to exemptions, it had been the policy of the Committee to write the bill so as not to conflict with the regulations of hours and wages when given to other governmental agencies.... ”).
Although the definition of “seaman” under the FLSA has generated a number of court decisions over the years, all that attention has not produced much in the way of clear rules.[4] As we observed in 1945: “The line of demarcation between seaman and non-seaman is not distinctly drawn, and probably cannot be. It depends a good deal upon the facts in each case, especially upon the character of the *56 work that is principally engaged in.” Bay State Dredging, 149 F.2d at 351. Almost sixty years later, those words are still apt.
B. The Labor Department’s regulations
Soon after the FLSA’s enactment into law, the Secretary of Labor, Frances Perkins, issued Interpretive Bulletin No. 11, which provided the Labor Department’s views on how the seaman exemption should be interpreted. The heart of the Labor Department’s interpretation — the so-called “aid to transportation” test — derives from that interpretive bulletin, which states in part that an
[ejmployee will ordinarily be regarded as ‘employed as a seaman’ if he performs, as master or subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character.
Those words now appear unchanged at 29 C.F.R. § 783.31 (“Criteria for employment ‘as a seaman’ ”), along with some added citations to legislative history and case law. In 1948, the Labor Department made one change, deciding that an employee performs a “substantial amount of work of a different character” if that different work occupies more than 20 percent of his time during a workweek. See 29 C.F.R. § 783.37. Since 1948, the parties agree that there have been no substantive changes to these interpretive regulations.[5]
The Labor Department’s regulations give some content to the vague concept of being “employed as a seaman” by stressing the character of the work performed by the employee. We echoed that approach in Bay State Dredging, where we described the character of a seaman’s work as “essentially maritime.” Specifically, we said that “[wjhether a worker is a seaman, as the term is commonly used, depends on the character of his duties. If they are essentially maritime he is a seaman. Otherwise he remains a landsman.” 149 F.2d at 349; see also Harkins, 385 F.3d at 1102 (To qualify as a seaman, “the employee must do maritime-type work ....”) (emphasis added).
The regulations offer a few examples of workers who typically would or would not meet the Department’s “aid to transportation” test. So, for example, we read that “[t]he term ‘seaman’ includes members of the crew such as sailors, engineers, radio qperators, firemen, pursers, surgeons, cooks, and stewards, if their service is of type described in § 783.31.” Id. § 783.32. On the other hand, the term “seaman” typically does not include the following types of workers: concessionaires and their employees aboard a vessel, as well as dredge-workers, stevedores, and roustabouts. Id. § 783.33. Regardless of these lists of job titles, whether a worker is *57 “employed as a seaman” ultimately depends on “the character of the work he actually performs and not on what it is called or the place where it is performed.” Id.
The Labor Department’s description in its regulations of the origin of the seaman exemption also comports with the history recited in Bay State Dredging. See 29 C.F.R. § 783.29 (“Adoption of the exemption in the original 1938 Act”). According to that description, Congress excluded seamen from the FLSA’s overtime provisions to avoid jurisdictional overlap with admiralty law. In doing so, Congress intended to give the term “seaman” its “commonly accepted meaning, namely, one who is aboard a vessel necessarily and primarily in aid of its navigation.” Id. § 783.29(c). At the same time, however, that ordinary meaning “is governed by the context in which it is used and the purpose of the statute in which it is found.” Consequently, in the context of a remedial statute like the FLSA, “giving a liberal interpretation of the meaning of the term ‘seaman’ ... would frustrate rather than accomplish the legislative purpose” by excluding too many workers from the FLSA’s protective ambit. Id.
III.
I turn now to an evaluation of the three arguments that convinced the district court that McLaughlin’s complaint was insufficient as a matter of law.
A. “Water transportation workers”
In the district court and here, Boston Harbor argues that the phrase “water transportation worker” decides this ease now because McLaughlin, according to her own allegations, is a “water transportation worker.” That phrase appears once in Bay State Dredging. See 149 F.2d at 350. A variation of the phrase also appears in the Labor Department’s regulations. See 29 C.F.R. § 783.29(a) (the “general pattern of the legislative history” shows that Congress intended to exclude “workers performing water transportation services” from the FLSA’s overtime provisions). Boston Harbor asks, “If Plaintiff is not a water transportation employee, what is she?”
Boston Harbor misconceives the phrase’s importance to the analysis for two reasons. First, Boston Harbor simply takes the phrase out of context. In Bay State Dredging, we said that it was “apparent that in the hearing both [the union representative] and [Senator Black] used the term ‘seamen’ with its common meaning, referring solely to water transportation workers.” 149 F.2d at 350. It is not clear why Boston Harbor finds the term “water transportation worker” any more useful than the term “seaman” itself, which at least has the virtue of being the term that Congress chose to use in the statute. Consonant with that fact, the focus of our analysis in Bay State Dredging remained on the words of the statute: whether an employee was “employed as a seaman.” 29 U.S.C. § 213(b)(6). Our focus must remain the same in this case.
Second, Boston Harbor exaggerates the phrase’s importance when it claims that “courts have consistently defined the term ‘seamen’ [sic] as a water transportation worker.” Boston Harbor does not cite any cases for that proposition (besides, of course, Bay State Dredging), and I could not find any cases to support that claim. Indeed, far from Boston Harbor’s representation that courts have used the phrase “consistently,” the phrase has not appeared in any federal case since Bay State *58 Dredging in 194-5.[6]
Ultimately, Boston Harbor’s reliance on this phrase is a distraction from the inescapably fact-specific nature of the seaman inquiry:
[T]he words of the exemption are: “Employees employed, as seamen”. The italicized words mean something; they are not mere tautology. They warn us to look to what the employees do, and not to rest on a mere matter of a name, or the place of their work.... [W]hat he does is expressly made the test of exclusion.
Mitchell v. Stinson, 217 F.2d 210, 215 (1st Cir.1954) (quoting Walling v. W.D. Haden Co., 153 F.2d 196, 199 (5th Cir.1946)). If McLaughlin’s duties are “essentially maritime,” then she is a seaman. Bay State Dredging, 149 F.2d at 349. Based solely on the allegations in her complaint, there is at least reason to question whether McLaughlin qualifies as a seaman.
Moreover, the Supreme Court has cautioned that, because of the FLSA’s “remedial and humanitarian” purposes, the statute “must not be interpreted or applied in a narrow, grudging manner.” Tenn. Coal, Iron & R.R. Co. v. Muscoda Local No. 123, 321 U.S. 590, 597, 64 S.Ct. 698, 88 L.Ed. 949 (1944). Exemptions from the duties imposed by the FLSA on employers are to be “narrowly construed against the employers seeking to assert them and their application limited to those establishments plainly and unmistakably within their terms and spirit.” Arnold v. Ben Kanowsky, Inc., 361 U.S. 388, 392, 80 S.Ct. 453, 4 L.Ed.2d 393 (1960); see also Reich v. Newspapers of New Eng., Inc., 44 F.3d 1060, 1070 (1st Cir.1995) (quoting Arnold). McLaughlin’s duties as alleged in her complaint were not so obviously maritime in nature that she was “plainly and unmistakably” ineligible for overtime pay. Arnold, 361 U.S. at 392, 80 S.Ct. 453.
To be sure, in the Jones Act, which allows negligence suits to be brought against shipowners by “[a]ny seaman” injured “in the course of his employment,” 46 U.S.CApp. § 688(a), the term “seaman” has been defined broadly. We have acknowledged this divergence before: “[T]he term ‘seamen,’ used in various Acts,” is a “flexible term[ ], the meaning of which depends on the circumstances in which [it] is used and the purpose of the particular statute in which [it] occurs.” Bay State Dredging, 149 F.2d at 351; see also Har-kins, 385 F.3d at 1102 (“[Decisions interpreting the term ‘seaman’ in other statutes do not necessarily control its meaning in the FLSA.”).
Indeed, the divergent meanings of “seaman” make sense when one considers the different roles played by the term in the two statutes, both of which are remedial in nature. In the Jones Act, workers defined as “seamen” are included in the statute’s protections, while in the FLSA seamen are excluded from overtime pay. Therefore, in context, the expansive definition of “seaman” furthers the Jones Act’s purposes. Here, by contrast, an expansive definition of “seaman” informed solely by the unillu-minating phrase “water transportation worker” would undercut the FLSA’s purposes.[7]
*59 B. The Labor Department’s “aid to transportation” test
Boston Harbor maintains that the Labor Department’s regulations, including their reference to “workers performing water transportation services,” 29 C.F.R. § 783.29(a), justify dismissing McLaughlin’s claim. To reiterate, the Labor Department’s test provides that “[a]n employee will ordinarily be regarded as ‘employed as a seaman’ if he performs ... subject to the authority ... of the master aboard a vessel, service which is rendered primarily as an aid in operation of such vessel as a means of transportation.” 29 C.F.R. § 783.31.
Boston Harbor essentially says that the Department’s test, like the statutory term “seaman” and Bay State Dredging’s phrase “water transportation worker,” must be read broadly. Although McLaughlin did not perform any duties related to the operation of the ferry itself, like navigation or steering, she did perform various duties related to the passengers that the ferry transports.[8] Therefore, according to Boston Harbor, by aiding the passengers and thus contributing to the vessel’s overall mission, McLaughlin rendered service as an “aid in” the operation of the vessel as a means of transportation. At one point, Boston Harbor even asserts that “[b]y definition, a deckhand on a commuter boat is providing service in the operation of a vessel as a means of transportation” (emphasis added). But that definition would exclude employees from overtime pay based solely on their place of work, an approach rejected by the Department. See 29 C.F.R. § 783.33 (status as a seaman does not depend on “the place where [the work] is performed”).
It is important to note that the Department’s rejection of Boston Harbor’s position in its motion to dismiss, and its objection to the court’s ruling granting that motion, is based on the explicit language of the Department’s regulations, not an interpretation of the regulations. In those regulations, the Department states that a court should look to the work actually performed, “not on what it is called or the place where it is performed.” 29 C.F.R. § 783.33.[9] We echoed that principle our *60 selves in Bay State Dredging. Boston Harbor’s reading of the exemption simply does not comport with the fact-sensitive approach required by the Department’s regulations.[10]
C. Lack of reported cases
Third and finally, Boston Harbor said that it could not find any reported cases in which deckhands on commuter ferries were held to be entitled to overtime under the FLSA. This argument is another reflection of Boston Harbor’s unpersuasive categorical approach to this case. Speaking of “deckhands” in general terms is not helpful. More to the point, I could find no cases supporting the broad position of Boston Harbor that any deckhand on a ferry, irrespective of the nature of the deckhand’s work, qualifies as a seaman under the FLSA.
IV.
Both our precedent and the Labor Department’s regulations make clear that neither job titles nor the locus of the work are determinative in this case. The focus must be on the nature of the duties actually performed: whether they are maritime or non-maritime. Importantly, “maritime” in this context does not simply mean “takes place on the water.” If so, dredge-workers like the ones in Bay State Dredging would be seamen and thus ineligible for overtime pay. Rather, in the language of the Department’s regulation, maritime means “service which is rendered primarily as an aid in the operation of such vessel as a means of transportation.” 29 C.F.R. § 783.31.
McLaughlin’s service on the ferry may or may not fall within that regulation. Given that uncertainty, McLaughlin should have an opportunity to develop her case factually and thereby explain the precise context of her duties. After all, as we have said, the “line of demarcation between seamen and non-seamen is not dis *61 tinctly drawn, and probably cannot be. It depends a good deal upon the facts in each case, especially upon the character of work that is principally engaged in.” Bay State Dredging, 149 F.2d at 351. Therefore, the district court erred in dismissing McLaughlin’s complaint on the basis of Boston Harbor’s flawed legal arguments.

. Bay State Dredging was decided on stipulated facts. The plaintiffs worked on a hydraulic dredge, a floating platform equipped with a pump that can suck mud from a river bottom and propel it to shore through a pipeline. The personnel included “a captain, one operator, one mate, four deck-hands, one oil-er, one fireman, a cook, a mess-boy and a watchman.” 149 F.2d at 348. The captain *54 "usually has some knowledge of navigation.” Id. The dredge has some independent ability to move, although it may remain in one place for several weeks when working. When working far from Boston, the employees would live on board; when close to Boston, many would go ashore every day to sleep. Based on these facts, the court found that "[tjheir work was essentially connected with excavation and not with navigation,” id. at 349, they did not come within the seaman exemption of the FLSA, and they were thus entitled to overtime pay.

. Particular reference was made to -the Merchant Marine Act of 1936, Pub.L. No. 74-835, 49 Stat.1985, which among other things created the United States Maritime Commission. By passing the Act, Congress intended to "foster the development and encourage the maintenance” of a merchant marine able to serve the country’s commercial needs while also "capable of serving as a naval and military auxiliary in time of war or national emergency.” Title I, § 101. The Act did not say anything about overtime pay; the Commission was "directed to investigate the employment and wage conditions in ocean-going shipping” and then develop "minimum-manning scales and minimum-wage scales and reasonable working conditions” on board certain subsidized vessels. Title III, § 301(a). Those duties are assigned now to the Secretary of Transportation. See 46 U.S.C.App. § 1131.
The Maritime Commission no longer exists. It was abolished and its functions transferred to the Federal Maritime Board and the Secretary of Commerce. See 15 Fed.Reg. 3178 (May 24, 1950). Eleven years later, the Federal Maritime Board was abolished and its *55 functions transferred to what is now called the Federal Maritime Commission, which still exists today. See 26 Fed.Reg. 7315 (Aug. 12, 1961). Its regulations appear at 46 C.F.R. pts. 500-599.

. At the time, Hugo L. Black was a senator from Alabama. Shortly thereafter, President Franklin D. Roosevelt nominated him to serve on the Supreme Court, the Senate confirmed him, and he was sworn in as an Associate Justice on August 14, 1937.

. See, e.g., Harkins v. Riverboat Services, Inc., 385 F.3d 1099 (7th Cir.2004); Owens v. SeaRiver Maritime, Inc., 272 F.3d 698 (5th Cir.2001); Pacific Merchant Shipping Ass'n v. Aubry, 918 F.2d 1409 (9th Cir.1990); Dole v. Petroleum Treaters, Inc., 876 F.2d 518 (5th Cir.1989).

. In 1961, Congress amended the FLSA to, among other things, extend the law's minimum-wage provisions to seamen working on American-flagged vessels. (Before, no seamen had been entitled to the minimum wage.) Based on that amendment, the Fifth Circuit decided that Congress had acquiesced in the Labor Department's announced interpretation:
In 1961, Congress revisited seamen coverage making a few changes. [Congress] did not seek, however, to change the interpretive definition given by the Secretary as to who are seamen. See Lorillard v. Pons, 434 U.S. 575, 580, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978) ("Congress is presumed to be aware of an administrative or judicial interpretation of a statute and to adopt that interpretation when it re-enacts a statute without change.”).
Petroleum Treaters, 876 F.2d at 522 (citation omitted).

. This result holds true when searching for variants of the phrase, too, like "workers engaged in transportation by water.”

. The Jones Act is critical in the panoply of legal protections that Congress has provided for seamen. The Supreme Court has outlined a two-step test to determine if someone is a "seaman” under the Jones Act. First, "an employee’s duties must contribute] to the function of the vessel or to the accomplishment of its mission.” McDermott Int’l v. Wilander, 498 U.S. 337, 355, 111 S.Ct. 807, 112 L.Ed.2d 866 (1991). Second, "a seaman must have a connection to a vessel in navigation (or *59 tó an identifiable group of such vessels) that is substantial in terms of both its duration and its nature.” Chandris, Inc. v. Latsis, 515 U.S. 347, 368, 115 S.Ct. 2172, 132 L.Ed.2d 314 (1995). See also Stewart v. Dutra Constr. Co., - U.S. -, 125 S.Ct. 1118, 160 L.Ed.2d 932 (2005) (construing the meaning of the term "vessel” in the Longshore and Harbor Workers' Compensation Act).
Under the Jones Act, then, many workers are recognized as seamen even though their work has little or nothing to do, strictly speaking, with operating the vessel — e.g., "firemen, engineers, carpenters, and cooks.” McDermott, 498 U.S. at 343, 111 S.Ct. 807 (1991). The Court has rejected a narrow "aid to navigation” test in this respect. In the context of the FLSA, however, we rejected a broad test that would define the term "seaman” as being "flexible enough to cover groups of employees whose work is not directly connected with navigation and transportation by water, including dredge-workers.” 149 F.3d at 348. Again, context matters.

. In her brief, McLaughlin admits to the “occasional handling of lines during docking procedures,” a duty which relates more closely to operating the ferry itself. She did not mention that responsibility in her complaint's allegations, and we ignore it for present purposes. That acknowledgment emphasizes, however, the importance of developing the facts of this case carefully.

. As the Department states in its amicus brief, the district court's dismissal is tantamount to a finding that deckhands on commuter boats are exempt "water transportation workers” under 13(b)(6) [of the FLSA] as a matter of law. Clearly, the IB [interpretive bulletin] and the case law instruct that what the employee is called, or where the work is performed, is not determinative. Each case *60 must be analyzed independently in accordance with the Secretary’s "aid to transportation” test.
However, at the end of its brief, the Department loses its focus on the preliminary stage of this case when it "suggests that the case be remanded for a determination of the facts and for application of the law in accordance with the Secretary’s interpretation to those facts.” We are remanding for a determination of the facts. However, the district court will have to decide in the first instance if it is persuaded by the Secretary’s interpretation of the regulations applied to those facts.

. Boston Harbor makes the claim that the regulations incorporate two cases that excluded from overtime pay "all personnel employed by the owner on board ferries”: namely, Walling v. Keansburg Steamboat Co., 162 F.2d 405 (3d Cir.1947), and Helena Glendale Fairy Co. v. Walling, 132 F.2d 616 (8th Cir.1942). I disagree that either case stands for such a broad proposition. Both are marked by a paucity of information as to the actual duties of employees like McLaughlin.
The ferries in Keansburg Steamboat transported passengers from May to October and stayed moored to the dock the rest of the year. About half the crew would be dismissed for the mooring period, while the other half would stay on to perform repairs. 162 F.2d at 406. The court held that this second group remained seamen and were thus excluded from overtime pay. Id. at 407-08. Although the court also referred in passing to the first group of workers as seamen, they were not the focus of the case. Thus we do not have a good basis for comparing McLaughlin’s alleged duties with theirs.
Helena Glendale is similarly unenlightening for our purposes. That case principally concerned three employees of a ferry company who did not work on ferries at all: one, for example, worked as superintendent of a cotton plantation near the Mississippi River. 132 F.2d at 618-19. As for the actual ferry-workers employed by the company, the court noted that " [apparently” they were seamen, but, as in Keansburg Steamboat, the court did not say anything about the nature of their duties. Id. at 618.