[No. 33035-1-II.   Division Two.   June 20, 2006.]

PAULINE MORE, *Appellant*, v. THE DEPARTMENT OF RETIREMENT SYSTEMS, *Respondent*.

*James D. Oswald* (of *Law Offices of James D. Oswald*), for appellant.

*Robert M. McKenna, Attorney General,* and *Sarah E. Blocki, Assistant,* for respondent.

¶1 QUINN-BRINTNALL, C.J. — Pauline More is a member of the Washington State Public Employees' Retirement System, Plan 1 (PERS 1). Due to the nature of her public employment, More is not covered under the Industrial Insurance Act, Title 51 RCW. In 2003, More applied for pension benefits as the result of a degenerative joint disease. A PERS 1 member receives certain pension benefits if she "becomes totally incapacitated for duty and qualifies to receive benefits under Title 51 RCW as a result of an occupational disease." RCW 41.40.200(1). Because she is ineligible for benefits under Title 51 RCW, More's application was denied. More maintains that RCW 41.40.200(1) violates equal protection because it awards pension benefits for an occupational disease to only those members who qualify to receive benefits for the same disease under Title 51 RCW. We disagree and affirm the superior court's decision denying More's benefits claim.

## FACTS

¶2 A PERS 1 member is "retired" if she:

becomes totally incapacitated for duty as the natural and proximate result of an accident occurring in the actual performance of duty or . . . becomes totally incapacitated for duty and qualifies to receive benefits under Title 51 RCW as a result of an occupational disease, as now or hereafter defined in RCW 51.08.140, while in the service of an employer, without willful negligence on his or her part.

RCW 41.40.200(1). A PERS 1 member retired under RCW 41.40.200(1) receives a disability retirement pension until the age of 60, at which time the member receives a service retirement allowance. RCW 41.40.185, .210 - .220. The retirement allowance is calculated in part on the number of service credit years. RCW 41.40.185(2). A PERS 1 member retired under RCW 41.40.200(1) continues to receive service credit during any period of total incapacitation. RCW 41.40.220(2).

¶3 A totally incapacitated PERS 1 member who does not qualify under RCW 41.40.200(1) does not receive a disability retirement pension. But that member can receive a membership service pension if she has five years of service credit. RCW 41.40.180(1), .185(2). This service pension is calculated the same way as a retirement allowance except that the member does not receive service credit for periods of total incapacitation. RCW 41.40.185(2), .220(2).

¶4 Washington State Ferries (WSF) hired More in 1976, and she became a member of PERS 1. More served as an assistant engineer, oiler, and chief for WSF.

¶5 In 1998, More was diagnosed with degenerative joint disease in both thumbs and had reconstructive surgery. More opened a claim under the Jones Act, 46 U.S.C. § 688, maintaining that her thumb condition was the result of her WSF employment, and she received maintenance and cure.[1] WSF initially transferred More to a position accommodating her thumb conditions, but in May 2003, that position was eliminated, and More was forced to end her employment.

¶6 More then applied to the Department of Retirement Services (DRS) for pension benefits for an occupational disease under RCW 41.40.200(1). DRS denied More's application because, as a vessel crew member excluded from coverage under Title 51 RCW, she was ineligible for retirement under RCW 41.40.200(1). *See* RCW 51.12.100(1). More appealed to DRS and the superior court, and she now appeals to this court.

## ANALYSIS

¶7 As she did below, More maintains that RCW 41-.40.200(1) violates her right to equal protection by ex-

---

[1] The Jones Act extends to seamen the standards of the Federal Employers' Liability Act, 45 U.S.C. § 51, which renders an employer liable when its officers, agents, or employees negligently injure employees. The doctrine of maintenance and cure obligates employers to provide room, board, and medical care to a seaman injured on the job, even if through no fault of the employer. *See Harkins v. Riverboat Servs.*, 385 F.3d 1099, 1103 (7th Cir. 2004).

cluding her profession from retirement benefits for total incapacitation due to an occupational disease. We disagree.

¶8 The doctrine of equal protection guarantees that similarly situated persons receive like treatment under the law. *O'Hartigan v. Dep't of Pers.*, 118 Wn.2d 111, 121, 821 P.2d 44 (1991). The critical first step in an equal protection analysis is to define the classification at issue; this, in turn, defines the standard of review. *State ex rel. Sigler v. Sigler*, 85 Wn. App. 329, 334, 932 P.2d 710 (1997); *see also Willoughby v. Dep't of Labor & Indus.*, 147 Wn.2d 725, 748, 57 P.3d 611 (2002) (Madsen, J., concurring/dissenting) ("It is essential in equal protection analysis to look at the classifications drawn by the statute."). More argues that the pertinent class division is between WSF employees and all other PERS 1 employees. But under RCW 41.40.200(1), the pension benefits for an occupational disease turn on whether the PERS 1 member *qualifies to receive benefits under Title 51 RCW as a result of the occupational disease*. It is this qualification, or legislative line, that More challenges.

¶9 Title 51 RCW is Washington's Industrial Insurance Act (IIA). The legislative decision to tie PERS 1 retirement benefits for an occupational disease to qualification for IIA benefits for the same disease does not implicate a fundamental right or a suspect class. *See Harris v. Dep't of Labor & Indus.*, 120 Wn.2d 461, 477, 843 P.2d 1056 (1993). Thus, we review More's equal protection challenge to RCW 41.40.200(1) under the rational basis test. *Wash. Pub. Employees Ass'n v. Wash. Pers. Res. Bd.*, 127 Wn. App. 254, 263, 110 P.3d 1154 (2005); *see also Willoughby*, 147 Wn.2d at 739 ("Where, as here, finite state resources are involved, the court applies a rational basis test.").

¶10 Only in the rarest of cases will a statute fail to survive rational basis review. *DeYoung v. Providence Med. Ctr.*, 136 Wn.2d 136, 144, 960 P.2d 919 (1998). Rational basis review is extraordinarily deferential, and enacted statutes carry a heavy presumption of constitutionality.

*Seattle Sch. Dist. No. 1 v. Dep't of Labor & Indus.*, 116 Wn.2d 352, 362, 804 P.2d 621 (1991). A statute passes the rational basis test if it is rationally related to a legitimate state interest. Put another way, a statute is unconstitutional only if it classifies groups on grounds wholly irrelevant to the achievement of a legitimate state objective. *DeYoung*, 136 Wn.2d at 144. A statute will survive rational basis review if there is a conceivable legitimate objective for the classification; the objective need not have motivated the legislature or be supported by evidence or empirical data. *DeYoung*, 136 Wn.2d at 147-48; *Haberman v. Wash. Pub. Power Supply Sys.*, 109 Wn.2d 107, 140, 744 P.2d 1032, 750 P.2d 254 (1987). A conceivable rational speculation is sufficient to uphold the classification. *DeYoung*, 136 Wn.2d at 147-48.

¶11 If there is a legitimate objective for the classification, then there need not be a perfect fit between the objective and the means employed; all that is required is a rational relationship. *DeYoung*, 136 Wn.2d at 144. A statute survives rational basis review even if it is to some extent both underinclusive and overinclusive. *Campbell v. Dep't of Soc. & Health Servs.*, 150 Wn.2d 881, 901, 83 P.3d 999 (2004). This is particularly true in circumstances related to the beneficial disbursement of limited resources, for a line must be drawn somewhere. *Campbell*, 150 Wn.2d at 901; *Willard v. Dep't of Soc. & Health Servs.*, 91 Wn.2d 759, 763-64, 592 P.2d 1103 (1979).

¶12 IIA coverage for an occupational disease depends on the nature of the employment and the disease. Employee coverage under the IIA is mandatory for most jobs. *See* RCW 51.12.010 ("There is a hazard in all employment and it is the purpose of this title to embrace all employments which are within the legislative jurisdiction of the state."). Certain jobs are excluded from coverage under the IIA unless the employer opts in.[2] Washington employees of a

---

[2] These include criminal offenders performing community restitution and volunteer law enforcement officers. RCW 51.12.045, .140. RCW 51.12.020 also sets forth an extensive list of jobs subject to employer opt-in coverage under the IIA.

common carrier engaged entirely in interstate and foreign commerce are covered under the IIA unless the employees are covered under another state's workers' compensation laws. RCW 51.12.095(1). The IIA expressly excludes coverage for federal employees, RCW 51.12.060; railway employees, RCW 51.12.080; and, pertinent here, a seaman, i.e., the "master or member of a crew of any vessel," RCW 51-.12.100(1). As a crew member of a vessel, More's WSF employment undisputedly excludes her from coverage under RCW 51.12.100(1).

¶13 The IIA defines an "occupational disease" as "such disease or infection as arises naturally and proximately out of employment." RCW 51.08.140. This definition does not include "mental conditions or mental disabilities caused by stress." RCW 51.08.142. Under RCW 51.12.102, crew members otherwise excluded under Title 51 RCW may receive coverage for asbestos-related occupational diseases. RCW 51.12.102(1).

¶14 In 1986, the legislature amended RCW 41.40.200(1) to provide PERS 1 members with pension benefits for occupational diseases.[3] Before the 1986 amendment, pension benefits were available only to PERS 1 members totally incapacitated as the result of an accident. Former RCW 41.40.200 (1982). In reviewing More's claim, the superior court suggested the following hypothesis for why the legislature may have tied PERS 1 benefits for an occupational disease to qualification for IIA benefits for the

---

For example, the list includes sole proprietors or partners; services performed by an insurance agent, insurance broker, or insurance solicitor; services performed by a newspaper carrier selling or distributing newspapers on the street or from house to house; and jockeys while participating in or preparing horses for race meets.

[3] The 1986 amendment was the product of Senate Bill 3193, which originally passed the Senate without a requirement that the occupational disease also qualify for coverage under Title 51 RCW. SENATE JOURNAL, 49th Leg., Reg. Sess., at 212, 1152 (Wash. 1986). Senate Bill 3193 passed the legislature only after the House Ways and Means Committee amended the bill to include the qualification now at issue. HOUSE JOURNAL, 49th Leg., Reg. Sess., at 701, 971 (Wash. 1986). RCW 51.12.100 has excluded seamen from coverage under the IIA since at least 1961. We reject any contention that the legislature "accidentally" excluded seamen from obtaining the pension benefits generally available to PERS 1 members.

same disease: The Department of Labor and Industries (L&I), which administers the IIA, has historically been involved in the diagnosis and assessment of occupational diseases; PERS 1 members are largely covered by the IIA and such members will usually seek coverage under the IIA for an alleged occupational disease; and once L&I uses its expertise to determine whether coverage exists, DRS can invoke this determination to establish whether the PERS 1 member is entitled to pension benefits for an occupational disease. The thrust of the trial court's hypothesis is that the legislature amended RCW 41.40.200 to establish new potential pension benefits that did not significantly increase DRS's administrative costs.

¶15 More maintains that this logic is "directly contrary to the well-established rule that financial savings alone cannot justify an otherwise arbitrary classification." Reply Br. of Appellant at 7 (relying on *Hunter v. N. Mason High Sch.*, 85 Wn.2d 810, 539 P.2d 845 (1975), and *Willoughby*, 147 Wn.2d 725). But More reads too broadly the authority she relies on. In *Hunter*, the court held unconstitutional nonclaim statutes requiring a claimant to notify a government tortfeasor within a limited number of days of the tortious act in order to maintain a civil suit. The court concluded that the nonclaim statutes created two classes of tortfeasors, governmental and nongovernmental, and that the classification could not be justified "simply because they serve to protect the public treasury." *Hunter*, 85 Wn.2d at 818.

¶16 And in *Willoughby*, the court held unconstitutional statutes barring the disbursement of benefits for a permanent partial disability to prisoners who had no statutory beneficiaries and were unlikely to be released from prison. L&I argued that the statutes were justified to preserve state resources because the state provides prisoners with their basic needs. The court rejected this proffered basis for the statutes: "[T]he purpose of permanent partial disability benefits is to compensate injured workers for the loss of bodily functions, not to provide for their basic needs.

Moreover, saving money is not a sufficient ground for upholding an otherwise unconstitutional statute in any event." *Willoughby*, 147 Wn.2d at 737.

¶17 These cases do not stand for the proposition that *any* governmental interest is invalid if it implicates financial considerations. As previously noted, in rational basis review, we give great deference to a statute regulating the beneficial disbursement of limited funds precisely because it is the limited nature of the funds that requires drawing a line. *Campbell*, 150 Wn.2d at 901; *Willard*, 91 Wn.2d at 763-64. Under *Hunter* and *Willoughby*, there must be a rational tie between the government's interests in conserving resources and the legislative line drawn. If that rational connection exists, then the financial savings justification is a legitimate state interest and not merely a pretext to save an unconstitutional statute.

¶18 For example, the rational tie can involve a non-suspect or nonfundamental characteristic that imposes additional financial burdens. The legislature's consideration of the characteristic may have financial underpinnings, but it is the characteristic that motivates the legislature to draw a line, not a pure financial savings justification that can be invented post hoc for almost any challenged statute. Thus, in *Willoughby*, protecting the public purse was not a valid basis to uphold the statute because nothing about the nature of incarceration provided a legitimate basis for denying inmates recovery for the permanent loss of bodily functions. Likewise, in *Hunter*, nothing about the nature of government entities required that it receive quicker notice of its torts than other tortfeasors.

¶19 Federal precedent interpreting the equal protection clause of the Fourteenth Amendment is in accord. *See In re Det. of Turay*, 139 Wn.2d 379, 412, 986 P.2d 790 (1999) (equal protection clauses of the United States and Washington Constitutions have the same impact and interpretation), *cert. denied*, 531 U.S. 1125 (2001). In *Idaho Department of Employment v. Smith*, 434 U.S. 100, 98 S. Ct. 327,

54 L. Ed. 2d 324 (1977) (per curiam), the Court rejected an equal protection challenge to an Idaho statute awarding unemployment benefits to persons who attend night school but denying such benefits to persons attending school during the day. Idaho required that unemployment benefits be awarded only to persons likely to work full time. The Court wrote:

> [T]he [night/day school] classification serves as a predictable and convenient means for distinguishing between those who are likely to be students primarily and part-time workers only secondarily and thus ineligible for unemployment compensation and those who are primarily full-time workers and students only secondarily without the necessity of making costly individual eligibility determinations which would deplete available resources. The fact that the classification is imperfect and that the availability of some students desiring full-time employment may not be substantially impaired by their attendance at daytime classes does not . . . render the statute invalid under the United States Constitution.

*Smith*, 434 U.S. at 101-02.

¶20 The logic of *Smith* applies here. We agree with the superior court that in amending RCW 41.40.200(1) to create pension benefits for occupational diseases, the legislature could have intended to create a convenient means for DRS to determine coverage without the necessity of making costly individual eligibility determinations, i.e., by relying on L&I's determination of whether the alleged occupational disease was subject to coverage under the IIA.[4] We acknowledge that this framework is not perfect: It excludes a small class of PERS 1 members who have an occupational disease but are excluded from coverage under the IIA due to the nature of their employment,[5] and it does not eliminate

[4] It is worth noting that for PERS 2 and 3 members, there is no requirement that the occupational disease also be covered under the IIA. *See* RCW 41.40.670, .825. But the PERS 2 provision has been in effect since 1977 and the PERS 3 provision was enacted in 2000; the legislative concerns and intentions at those times have little relevance to those of the 1986 legislature.

[5] As noted in note 1, *supra*, More's employment entitles her to coverage under the Jones Act.

the possibility that DRS will have to make individual eligibility determinations in the highly unlikely situation where a PERS 1 member does not seek benefits under the IIA. But the rational basis test does not require a perfect or even tight fit. We hold that RCW 41.40.200(1) is rationally related to the legitimate governmental interest in creating new benefits that do not create significant administrative costs. RCW 41.40.200(1) does not violate the principle of equal protection.

¶21 Affirmed.

HUNT and VAN DEREN, JJ., concur.