Foley & Martin, New York City (Christopher E. Heckman, New York City, Francis A. Wade, New York City, of counsel), for defendants McAllister Lighterage Line, Inc., C. F. Harms Co., O'Brien Bros., Inc., Henry Gillen's Sons Lighterage, Inc., F. E. Grauwiller Transp. Co., Inc. and Jacob Rice & Sons.

Burlingham, Veeder, Clark & Hupper, New York City, Herbert M. Lord, New York City, of counsel, for defendant Manhattan Lighterage Corp.

**MARTIN et al. v. McALLISTER LIGHTERAGE LINE, Inc., et al.**

United States District Court
S. D. New York.
Aug. 9, 1951.

CONGER, District Judge.

This is a suit under the Fair Labor Standards Act, 29 U.S.C.A. § 201 et seq., by numerous captains of deck scows operating in and around New York and other nearby points against their respective employers, the various owners of the deck scows.

This action was commenced on March 15, 1948 and the demand in the complaint for overtime pay and liquidated damages

covers the two years immediately preceding that date.

The Act exempts from its application "any employee employed as a seaman". 29 U.S.C.A. § 213. The primary question, therefore, is whether or not the plaintiffs are in fact seamen within the meaning of the term as used in the Act.

The defendants stipulated that all of the plaintiffs need not testify; that all of the plaintiffs would have to make one appearance in Court to indicate their consent to the bringing of this lawsuit and that the testimony of some of the plaintiffs would be taken on behalf of all of the plaintiffs and would be binding upon all of the parties. Pursuant to this stipulation some of the plaintiffs appeared and testified at length; others simply testified to indicate their consent to the bringing of the action. Several plaintiffs made no appearance and their claims were dismissed.

A jury trial was waived by the parties and the action was brought to the Court without a jury.

The scows upon which the plaintiffs are employed are used for transportation of merchandise generally about the New York area. Stipulations marked in evidence show the activities of the scows. Some of the scows travelled between New York and Perth Amboy and Carteret, New Jersey; others to various New Jersey points. Some travelled between New York and points on Long Island Sound and some up the Hudson River to sand and gravel quarries, and others travelled on Long Island Sound as far as Bridgeport and New Haven, Connecticut. All of the scows were engaged in the same kind of activity, i. e. the carrying of cargoes of various types of merchandise. No distinction may be made as to any defendant here because of the type of cargo its scows carried or the places to which its scows travelled.

It was stipulated that the plaintiffs did not load nor unload any of the scows [and there was no contention on the part of plaintiffs that they had any duties in the actual loading and unloading].

The scows had no motive power of any kind and depended upon tugs to tow them.

All of the scows had a structure on the stern deck which was described as a cabin. The cabin was furnished with various articles which the defendants supplied, such as a coal stove, bed, table and chairs, a blanket and some cooking utensils.

The plaintiffs were paid in accordance with a union contract on a monthly basis. It was not necessary for them to have seamen's licenses. In 1946 and 1947 their pay varied from $130 to $170, depending upon the type of cargo carried and whether the scow upon which they were working was chartered to a railroad. If a captain failed to be aboard his scow when towed between 7:00 A.M. and 5:00 P.M. his pay would be deducted for that day.

The contract prescribed no special working hours, but it did provide for "premium pay" to captains required to be on duty between the hours of 5:00 P.M. and 7:00 A.M.

There is very little dispute over the plaintiffs' duties. They uniformly testified as to their work and it is clear that their primary duties were nautical. These duties included attending to lines, displaying lights, pumping out bilge water, putting out fenders, examining vessel for damage and leakage, observing of loading and unloading of cargo for proper distribution in scow, taking soundings of depth of water in certain berths, splicing of lines and the like. Some plaintiffs testified that they made emergency repairs by the use of oakum and cotton and repaired small holes in the deck. In general, the scow captain attends to the welfare of the vessel.

The plaintiffs argue, however, that these duties represent a minor part of the work they do, and that their principal duties were those of watchmen.

Actually, I take it that their nautical duties on a normal day did not require more than an hour or two of physical effort except during towing. The rest of the time, apparently, they slept, ate, relaxed, read or busied themselves in any other fashion they liked until it was necessary to perform another nautical duty.

I suppose that while they so comported themselves they were no more than watch-

men and especially at night when on occasion they were required to remain aboard a scow loaded with valuable cargo. But even then they were not watchmen in the sense that they were there to prevent pilferage and the like, although they would naturally be a deterrent to such an act. Rather, they were nautical watchmen alert for any damage to the boat through shifting or tide changes or collision; and so for the protection of the cargo.

In my view they are seamen and not watchmen any more than a seaman on a self-propelled vessel is a watchman when he stands watch on a voyage or in port.

 In an interpretive bulletin issued in 1947, the Wage and Hour Administrator of the Department of Labor had this to say in connection with the seaman exemption:

"An employee will ordinarily be regarded as 'employed as a seaman' if he performs, as master or subject to the authority, direction, and control of the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character: In our opinion, this exemption extends to employees performing such service on vessels navigating inland waters as well as on ocean-going and coastwise vessels."

"Barge tenders on non-self-propelled barges who perform the normal duties of their occupation, such as attending to the lines and anchors, putting out running and mooring lines, pumping out bilge water, and other similar activities necessary and usual to the navigation of barges, are considered seamen within this exemption unless they do a substantial amount of nonexempt work. Loading and unloading and activities relative thereto will be considered nonexempt work. Employees on seagoing barges would also seem to be employed as seamen if their services are of the type described in paragraph (a) of this section." [(a) is quoted above]

These bulletins are entitled to weight by the Court. United States v. American Trucking Ass'ns, 310 U.S. 534, 60 S.Ct. 1059, 84 L.Ed. 1345.

I believe these interpretations encourage the notion that the plaintiffs are exempt from the Act. See also Norton v. Warner Co., 321 U.S. 565, 64 S.Ct. 747, 88 L.Ed. 931; Gale v. Union Bag & Paper Corp., 5 Cir., 1940, 116 F.2d 27, certiorari denied 313 U.S. 559, 61 S.Ct. 837, 85 L.Ed. 1519.

They are employed primarily to aid in the operation of the vessel and they do not do a substantial amount of nonexempt work.

The plaintiffs would pursuade the Court that all nonphysical work, i. e. watching, is nonexempt work but I feel that their duties in the entirety relate to the operation of the vessel. They "watched" only for a nautical assignment to arise.

 Concluding that the plaintiffs are seamen and therefore exempt from the Act, I find it unnecessary to decide the defenses raised by the defendants in accordance with the Portal-to-Portal Act of 1947, 29 U.S.C.A. § 251 et seq.