Eric McMAHAN, et al., Plaintiffs,

v.

ADEPT PROCESS SERVICES, INC., Defendant.

Civil No. 2:10cv278.

United States District Court, E.D. Virginia, Norfolk Division.

May 24, 2011.

Keith John Leonard, Huffman & Huffman, Newport News, VA, for Plaintiffs.

Herbert Allen Black, III, Emily Kate Hargrove, Charles Bennett Molster, III, Winston & Strawn LLP, Washington, DC, for Defendant.

## ORDER

HENRY COKE MORGAN, JR., Senior District Judge.

This case arises under the Fair Labor Standards Act ("FLSA"). 29 U.S.C. §§ 201, et seq. Defendant Adept Process Services, Inc. ("APS") moves for summary judgment pursuant to Federal Rule of Civil Procedure 56 ("Rule 56") on the ground that Plaintiffs' asserted claims for overtime pay are expressly barred by 29 U.S.C. § 213(b)(6), which exempts from the FLSA's overtime pay requirements "any employee employed as a seaman." Docs. 21, 22; 29 U.S.C. § 213(b)(6). For the reasons contained herein, the Court **GRANTS** APS's motion for summary judgment.

### I. Procedural History

On June 15, 2010, Plaintiffs Eric L. McMahan ("McMahan"), James E. Cooke ("Cooke"), Christopher E. Brown ("Brown"), Joshua Wiggins ("Wiggins"), Alexander F. Barranger ("Barranger"), Peter Milton ("Milton"), Jeffrey Harrell ("Harrell"), and Alex Rogers ("Rogers") (collectively, "Plaintiffs") filed their complaint against APS.[1] Doc. 1. Plaintiffs

---

1. Plaintiffs initially filed suit against Defendants Adept Process Services, LLC and Adept

McMahan, Cooke, Harrell, and Rogers are, or were, employed by APS as Captains at Naval Station Norfolk in Norfolk, Virginia.[2] Doc. 22. Plaintiffs Brown, Wiggins, Barranger, and Milton are, or were, employed as deckhands.[3] *Id.* Collectively, Plaintiffs claim that APS willfully violated the overtime pay provisions of the FLSA and is, therefore, liable to Plaintiffs "in the total amount of Plaintiffs' unpaid overtime compensation and an additional equal amount as liquidated damages, for the three year period immediately preceding the commencement of this action, as well as an amount for reasonable attorney's fees and interest, together with the costs and expenses of this action." [4] Doc. 1 at ¶¶ 34–36.

On March 24, 2011, APS moved for Rule 56 summary judgment on the ground that Plaintiffs' claims for overtime pay are barred by the "seaman exemption" in 29 U.S.C. § 213(b)(6). Doc. 22 at 1. Plaintiffs filed a response on April 4, 2011, contend-ing that they are and were not "seamen" for FLSA exemption purposes and are, therefore, entitled to overtime pay. Doc. 23 at 45. APS filed a reply on April 6, 2011. Doc. 25. A hearing on APS's motion was held on May 9, 2011.

## II. FACTUAL BACKGROUND

In accordance with Local Civil Rule 56(B), the Court assumes as admitted the facts set forth at pages 311 of APS's memorandum in support of its motion for summary judgment. Doc. 22. APS's "Statement of Undisputed Facts" is adopted in whole because Plaintiffs' responsive brief contains no specifically captioned section listing the material facts that it wishes to dispute, and it does not otherwise appear that Plaintiffs dispute such facts.[5] *See Blaustein & Reich, Inc. v. Buckles,* 220 F.Supp.2d 535, 539 (E.D.Va.2002) ("[N]on-compliance with the requirements set forth in Local Rule 56(B) triggers the consequence set forth in that rule, e.g. the facts identified by the Defendant as material

---

Process Services, Inc. On November 19, 2010, the parties filed a joint motion to dismiss Count II of Plaintiffs' complaint and Defendant Adept Process Services, LLC. Doc. 12. The Court granted the parties' joint motion to dismiss on November 22, 2010. Doc. 16. Adept Process Services, Inc. is, therefore, the sole remaining defendant in this case.

2. The parties jointly stipulate that "[t]he term 'Captain(s)' means persons employed by APS as masters of the Boats," and "[t]he term 'Boat(s)' refers to the small tugboats operated by APS at Naval Station Norfolk, Virginia." Doc. 24.

3. The parties stipulate that "[t]he term 'Deckhand' means persons employed by APS as crewmembers on the Boats." *Id.*

4. Plaintiffs' complaint originally contained a second count against APS—"Count Two (Retaliation Claim)." However, as noted *supra* note 1, the parties filed a joint motion to dismiss Count II of Plaintiffs' complaint and Defendant Adept Process Services, LLC on November 19, 2010, Doc. 12, and the Court granted that motion on November 22, 2010, Doc. 16. Thus, Plaintiffs' retaliation claim was dismissed, and the Court need only address the allegations set forth in the FLSA claims contained in Plaintiffs' sole remaining count, "Count One."

5. Local Civil Rule 56 mandates that a brief submitted in support of a movant's motion for summary judgment "include a specifically captioned section listing all material facts as to which the moving party contends there is no genuine issue and citing the parts of the record relied on to support the listed facts as alleged to be undisputed." Local Civil Rule 56(B). In response, the nonmovant is required to "include a specifically captioned section listing all material facts as to which it is contended that there exists a genuine issue necessary to be litigated and citing the parts of the record relied on to support the facts alleged to be in dispute." *Id.* If a nonmovant fails to set forth a statement of genuine issues as required by the rule, "the Court may assume that facts identified by the moving party in its listing of material facts are admitted." *Id.*

facts as to which there is no genuine issue in its opening brief are admitted."), *aff'd,* 365 F.3d 281 (4th Cir.2004).[6] Plaintiffs' brief and oral argument assumes the accuracy of APS's "Statement of Undisputed Facts," and Plaintiffs base their argument upon their interpretation of such facts. The admitted facts are as follows:

1. The Boats operated by the Plaintiffs are 29 foot mini-tugs, each of which has an enclosed pilothouse, radar, GPS navigation system, radio, depthsounder, and loudhailer. The Boats are self-propelled by twin Cummins QSL9 diesel engines, rated for 285 horsepower at 1800 engine rpm, with fixed nozzles and rudders. The Boats have deck fittings and fendering systems to support their work as tug boats, including forward and aft tow posts and four quarter (mooring) posts, fittings at the bow for pushing barges and other tows ahead (referred to as "push knees"), and six-inch thick rubber fendering around the hull and on the push knees. The propulsion and fittings are rated for a 14,000 lbs. of bollard pull. The vessels have hoisting fittings, deck worklights, spotlights, and navigation lights.

2. APS crews the Boats with two-person Boat Crews, each consisting of a Captain and a Deckhand.

3. During weekdays, the Navy typically requires APS to have up to five Boat Crews available to carry out the scheduled and unscheduled Moves.[7]

4. Each Captain is required to hold valid U.S. Coast Guard issued licenses and certifications.

5. The 2007 Contract, the 2010 Renewal, and all of the renewals in between specify that the Boat Crews are to work a twelve-hour day, paid at a day rate. They further specify "overtime hours" as "hours in excess of the 12–hour work day."

6. The Boat Crew manning was specified by the 2007 Contract and its attached "Wage Determination 94–0196 17 Vessels," (the "Wage Determination") issued by the U.S. Department of Labor ("DOL").

7. The Wage Determination is for individuals who are "employed on contracts for special project vessels, tugboats, and other coastal vessels."

8. The Wage Determination states that the "daily rate cannot be computed to an hourly rate."

9. The Captains and Deckhands are considered seamen under the Jones Act (46 U.S.C. § 30104) and are covered under APS's marine employer's liability insurance.

10. Many of the Boat Crews treat their time operating Boats on behalf of APS as qualifying experience and/or training to meet Coast Guard requirements to obtain or maintain Coast Guard Merchant Marine Officer licenses.

---

**6.** *See also Hadeed v. Abraham,* 265 F.Supp.2d 614, 616 (E.D.Va.2003) ("By operation of Local Rule 56(B), all facts proffered by the Defendants which Plaintiffs did not contest are admitted for the purposes of the summary judgment motion."); *Lufti v. United States,* No. 1:09cv1114, 2011 WL 1226030, at *2, 2011 U.S. Dist. LEXIS 33074, at *5 (E.D.Va. Mar. 28, 2011) ("In circumstances such as this, where the defendant's memorandum of law in support of a motion for summary judgment complies with Local Civ. R. 56(B), but

the plaintiff's opposition fails to comply with Local Civ. R. 56(B), the facts identified by the defendant as material facts as to which there is no genuine issue are admitted.") (citing *Blaustein & Reich, Inc.,* 220 F.Supp.2d at 539).

**7.** The parties stipulate that "[t]he term 'Move' refers to an operation conducted by a Boat under the APS contract at Naval Station Norfolk." Doc. 24.

11. All of the Plaintiffs are (or were) at-will employees of APS and are (or were) employed as Captains or Deckhands.

12. All of the Plaintiff are, or were, members of the Boat Crews employed by APS to operate the Boats at Norfolk Naval Station in Norfolk, Virginia.

13. All of the Captain Plaintiffs were hired by APS as U.S. Coast Guard licensed Captains to operate the Boats.

14. All of the Captain Plaintiffs held U.S. Merchant Marine Officer Master's Licenses during the times that they worked for APS.

15. All of the Deckhand Plaintiffs obtained Merchant Mariner Documents as Ordinary Seamen either before or during their employment with APS.

16. The sole duty of Deckhand Plaintiffs Wiggins, Brown, Barranger, and Milton during their employment with APS was to serve as Deckhands on the Boats. They performed no other duties as employees of APS.

17. During the working day when not operating the Boats, the Boat Crews could wait in the Boathouse, sit in their cars, listen to the radio, carry out personal errands, work out, or otherwise use their time as the wished, subject only to the constraint that they must remain in the vicinity of the Naval Base and be available for calls so that they could respond if needed to operate the Boats for unscheduled Moves.

18. The sole duty of each of Captains Rogers, Harrell, and Cooke during their employment with APS was to serve as a Captain. They performed no other duties as employees of APS.

19. Captain McMahan's sole duty with APS throughout his employment was to serve as a Captain; during a portion of his employment with APS he also served as a Designated Examiner. He performed no other duties as an employee of APS.

20. The duties of the Captains employed by APS at Naval Station Norfolk have been, and are, to operate the Boats, to prepare their assigned Boats for upcoming Moves, and to stand by to operate the Boats.

21. The Moves carried out by the Captains using the Boats included navigating the Boats on the waters of Naval Station Norfolk and adjacent waters, towing PSB[8] sections, towing barges, towing paint floats, towing floating fenders, and from time to time towing miscellaneous objects.

22. An operation carried out in connection with the PSB sections typically involves navigating the Boat from the dock or other location to the designated PSB section, unmooring the PSB section from a buoy, tying up the PSB section to

**8.** APS explains that it operates a fleet of U.S. Navy-owned Boats at Naval Station Norfolk and provides crews that "operate the Boats to open, close, and check on the status of floating port security barriers ('PSBs') that are used by the Navy to protect the Navy vessels moored at the Naval Station." Doc. 22 at 2. APS further explains, "The barrier system consists of sixteen floating foam filled hulls connected to buoys and to each other with removable links, with netting to create a fence-like appearance. The barrier system covers 2.37 miles of the Naval Station waterfront." *Id.* In their response to APS's motion for summary judgment, Plaintiffs refer to the PSB as the "port security barrier." In depositions, two of the Plaintiff Captains and two of the Plaintiff Deckhands referred to PSBs as "physical" security barriers rather than "port" security barriers, one Plaintiff Deckhand answered "I believe so" when asked if "PSB" stood for "permanent security barrier," and another Plaintiff Deckhand referred to PSBs as "protective" security barriers. In any event, PSB(s) refers to the floating barrier at Naval Station Norfolk that APS was tasked with opening and closing.

the Boat by tying lines from the PSB section to bitts and/or cleats on the Boat, using the engines and steering of the Boat to maneuver and tow the PSB section clear of the buoy, hold it in position as directed, then tow it back to the buoy, cast off the PSB section from the Boat, and moor it to the buoy.

23. The operation of the Boats calls for the Captains to exercise seamanship and professional judgment, to steer, navigate, and maneuver the Boats, to operate the Boats in accordance with the Navigation Rules, to avoid collisions and interference with other vessels, to monitor and operate the Boats' radios, to operate the Boats' radars, to operate the Boats' GPS navigation equipment, and to perform towing and related maritime operations.

24. The Captains, as the Masters of the Boats to which they were assigned, exercised command and responsibility for the safety of the Boat and its crew.

25. The Captains also maintained various records related to their operation of the Boats, including incident reports, administrative boat logs, and maintenance logs.

26. During the times the Captains were not underway operating the Boats, they had no other duties other than to keep the Boats ready to get underway, and to wait for additional underway operations.

27. The duties of the Deckhands employed by APS at Naval Station Norfolk have been, and are, to assist the Captains with the operation of the Boats under the direction of the assigned Captain.

28. The Deckhands work under the direction of the assigned Captain in the day-to-day operation of the Boats.

29. The tasks performed by the Deckhands include crewing the Boat with the assigned Captain, checking the equipment on the Boat at the start of each work day to ensure that the Boat is ready for operations, checking oil levels in the Boat engine, turning on the Boat batteries, in conjunction with the Captain or as directed, turning on and checking other equipment on the Boat including the Navigation Lights, the radio, the radar, the GPS, the depthsounder, and the loudhailer, handling lines on the Boat, getting underway on the Boat, unmooring PSB sections from buoys and making them up to the Boat by tying lines from the PSB to bitts and/or cleats on the Boat, making other tows up to the Boat by tying lines from the tows to bitts and/or cleats on the Boat, assisting the Captain as necessary while the Boat is towing PSB sections, barges, fenders, or other objects, untying PSB sections or other tows from the Boat, mooring PSB sections to buoys, mooring barges, fenders, and other objects to piers or docks, observing the condition of the PSB hulls and retying lines as needed, tying up the Boat to the dock, washing salt water off the Boat, replacing lines on the Boat, and occasionally changing oil or filters on the Boat.

30. A contractor other than APS carries out the maintenance of the PSB sections.

31. A Naval Station entity carries out the maintenance of the Boats.

32. The Deckhands do not operate any machinery other than the Boats.

33. When not underway on the Boats, Deckhands have no duties other than to prepare the Boats for the upcoming operations and to wait for upcoming operations on the Boats.

34. The Deckhands performed no other duties other than those in connection

with preparation or operation of the Boats.

Doc. 22 at 311 (internal citations omitted).[9]

On April 6, 2011, the parties jointly stipulated to the following additional undisputed facts: APS required Captains to make entries in Boat Usage Logs [10] each day for each Boat to which the Captains were assigned. Doc. 24 at ¶ 1. The Boat Usage Logs recorded boat movements and other matters affecting the Boats. *Id.* at ¶ 2. An entry of "Standby 5T" indicates that a Boat was not underway during the indicated time. *Id.* at ¶ 3. When not underway, "Plaintiffs might spend a few minutes over the course of a month ... splicing lines[,] going to the APS office[, and/or] sweeping and emptying the trash in and around the boathouse." [11] *Id.* at ¶ 4. When not underway and not performing any of the above activities, "Plaintiffs were on standby to respond if needed to operate the Boats for an unscheduled Move but were otherwise free to use their time as they wished subject only to the constraint that they must remain in the vicinity of the Naval Base and be available for calls to operate Boats." *Id.* at ¶ 5. When not underway, Plaintiffs could "read magazines/books/newspapers, go on the internet, watch movies, sleep, sit in their vehicles, throw a football, and socialize." *Id.* at ¶ 6. Plaintiffs could also "go to the store,

work-out at the gym adjacent to the Boathouse, go to the exchange, go to the bank, and do similar personal errands." *Id.* The only constraint on Plaintiffs' freedom of activity was that Plaintiffs were required to remain in the vicinity of the Naval Base and be available for a call so that they could respond if needed to operate Boats for an unscheduled Move.[12] *Id.* Deckhands were not provided with communication devices to carry when they were not underway—during "Standby 5T" status periods. *Id.* at ¶ 10.

## III. ANALYSIS

Entry of summary judgment is proper when "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. Proc. 56(c). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment. Factual disputes that are irrelevant or unnecessary will not be counted." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). The Court resolves all factual disputes and competing, rational inferences in the light most favorable to the nonmovant.

9. As APS contends, "[e]ven if the Court were to be lenient and overlook the Plaintiffs' non-compliance with the Rule [Rule 56(B)], and attempt to cull out a response in Plaintiffs' 'Factual Background,' it would find that Plaintiffs have not challenged any of Defendants' [sic] statement of undisputed facts." Doc. 25 at 1. The parties agree on the operative facts; they simply disagree about whether Plaintiffs' work activities place Plaintiffs within the FLSA's "seaman" exemption.

10. The parties stipulate that "[t]he term 'Boat Usage Log(s)' refers to records concerning each Boat maintained by APS and its employees at Naval Station Norfolk." Doc. 24.

11. The parties stipulate that "[t]he term 'Boathouse' refers to the covered dock area and building used by APS at Naval Station Norfolk where the Boats dock when not underway." *Id.*

12. A "Move Sheet" set forth the schedule of moves to be performed by APS. *Id.* at ¶ 7. At times, APS would be directed to carry out additional, unscheduled Moves, commonly called "Add–Ons," and last-minute changes were sometimes made to the "Move Sheet." *Id.* at ¶ 8.

*Rossignol v. Voorhaar,* 316 F.3d 516, 523 (4th Cir.2003).

The determination of whether an employee's activities place that employee within a FLSA exemption is a question of law; the question of what an employee's work activities entail is a question of fact. *See Icicle Seafoods, Inc. v. Worthington,* 475 U.S. 709, 714, 106 S.Ct. 1527, 89 L.Ed.2d 739 (U.S.1986) ("The question of how the respondents spent their working time on board the Arctic Star is a question of fact. The question whether their particular activities excluded them from the overtime benefits of the FLSA is a question of law."); *Walton v. Greenbrier Ford, Inc.,* 370 F.3d 446, 450 (4th Cir.2004) ("The determination of whether an employee falls within the scope of a FLSA exemption is ultimately a legal question." (citing *Icicle Seafoods, Inc.,* 475 U.S. at 713–14, 106 S.Ct. 1527)). Whether employees qualify as FLSA-exempt seamen is a fact-sensitive inquiry. *See Dole v. Petroleum Treaters, Inc.,* 876 F.2d 518, 522 (5th Cir. 1989) (noting that the determination of whether a particular worker is eligible for the seaman exemption "calls for an examination of the nature of the work performed by the employees and of the comparative amount of seamen versus nonseamen duties"); *Godard v. Alabama Pilot, Inc.,* 485 F.Supp.2d 1284, 1292–93 (S.D.N.Y. 2007) ("This is necessarily a fact-sensitive inquiry.") (citing *Walling v. Bay State Dredging & Contracting Co.,* 149 F.2d 346, 351 (1st Cir.1945) ("The line of demarcation between seamen and non-seamen is not distinctly drawn, and probably cannot be. It depends a good deal upon the facts in each case, especially upon the character of the work that is principally engaged in.")). It is the employer's burden to prove that its employees fall within the scope of an FLSA exemption. *Godard,* 485 F.Supp.2d at 1293 (citing *Martin v. Bedell,* 955 F.2d 1029, 1035 (5th Cir.1992)). Finally, it is well-settled that exemptions

from the FLSA are to be narrowly construed. *A.H. Phillips, Inc. v. Walling,* 324 U.S. 490, 493, 65 S.Ct. 807, 89 L.Ed. 1095 (1945).

In this case, there is no dispute over Plaintiffs' duties. As noted in the preceding section of this Memorandum, there is no genuine issue as to those facts listed as 1 to 34 above and the facts provided in the parties' April 6, 2011 joint stipulation of facts. The Court, therefore, turns to an analysis of whether the admitted and stipulated facts entitle APS to summary judgment that Plaintiffs' claims for overtime pay are expressly barred by 29 U.S.C. § 213(b)(6) because Plaintiffs are "seamen."

## A. THE FLSA'S SEAMAN EXEMPTION

The FLSA sets forth maximum work hour limitations, requiring that an employer pay overtime at a rate of one and one half times an employee's regular hourly rate for all hours worked in excess of forty per week. 29 U.S.C. § 207; *Walton,* 370 F.3d at 449–50. The FLSA excludes many classes of employees from its overtime pay requirements, including "any employee employed as a seaman." 29 U.S.C. § 213(b)(6). The Department of Labor (the "DOL") has promulgated regulations addressing application of the FLSA to employees employed as seamen. *See* 29 C.F.R. § 783.0 ("This part 783 is the official interpretation of the Department of Labor with respect to the meaning and application of sections 6(b)(2), 13(a)(14), and 13(b)(6) of the Fair Labor Standards Act, as amended, which govern the application of the minimum wage and overtime pay requirements of the Act to employees employed as seamen.").

The DOL advises that "an employee will ordinarily be regarded as 'employed as a seaman' if he performs, as master or subject to authority, direction, and control of

the master aboard a vessel, service which is rendered primarily as an aid in the operation of such vessel as a means of transportation, provided he performs no substantial amount of work of a different character." 29 C.F.R. § 783.31. "This is true with respect to vessels navigating inland waters as well as ocean-going and coastal vessels." *Id.* (citations omitted). The DOL lists as "seamen" crew members such as sailors, engineers, radio operators, firemen, pursers, surgeons, cooks, and stewards, and the DOL explains that "an employee employed as a seaman does not lose his status as such simply because, as an incident to such employment, he performs some work not connected with operation of the vessel as a means of transportation, such as assisting in the loading and unloading of freight ... if the amount of such work is not substantial." 29 C.F.R. § 783.32.

The DOL further advises:

Whether an employee is "employed as a seaman", within the meaning of the Act, depends upon the character of the work he actually performs and not on what it is called or the place where it is performed. Merely because one works aboard a vessel, or may be articled as a seaman, or performs some maritime duties one is not employed as a seaman within the meaning of the Act unless one's services are rendered primarily as an aid in the operation of the vessel as a means of transportation, as for example services performed substantially as an aid to the vessel in navigation.

29 C.F.R. § 783.33 (internal citations omitted). Listed as "not 'seamen'" are stevedores; longshoremen; concessionaires and their employees; employees on floating equipment engaged in the construction of docks, levees, revetment, and other structures; employees engaged in dredging or digging operations; and "captains" and "deckhands" whose dominant work is in-

dustrial activity performed as part of harbor dredging operations and not in furtherance of transportation. 29 C.F.R. § 783.33–34. Some watchmen are "seamen;" others are not. 29 C.F.R. § 783.35. Barge tenders are considered "seamen" unless they do a substantial amount of "non-seaman's" work. 29 C.F.R. § 783.36. Finally, a "seaman" will be regarded as such "even though during the workweek he performs some work of a nature other than that which characterizes the service of a seaman, if such nonseaman's work is not substantial in amount," and "such differing work is 'substantial' if it occupies more than 20 percent of the time worked by the employee during the workweek." 29 C.F.R. § 783.37.

■ The above DOL regulations are not controlling, but they do "constitute a body of experience and informed judgment to which courts and litigants may properly resort for guidance." *Skidmore v. Swift & Co.,* 323 U.S. 134, 140, 65 S.Ct. 161, 89 L.Ed. 124 (1944).

## B. PLAINTIFFS' WORK WAS SEAMEN'S WORK

■ As APS contends, "Plaintiffs' testimony unequivocally demonstrates that they were/are 'employed as seam[e]n' by APS." Doc. 22 at 15. APS accurately points out that "Plaintiffs testified that all or virtually all of their duties were tasks directly related to operating vessels: preparing the vessels to get underway, operating the vessels while underway, connecting floating objects to the vessels for purposes of towing them, securing tows to buoys and docks, securing vessels once returned to the dock, and standing by waiting to be called to get underway." *Id.* Such duties are seamen duties: they are services rendered primarily as an aid to the operation of a vessel as a means of transportation. 29 C.F.R. § 783.31; *see also Martin v. McAllister Lighterage*

*Line, Inc.,* 102 F.Supp. 41, 43 (S.D.N.Y. 1952) (finding that plaintiffs were exempt from the FLSA as "seamen" after noting that their primary duties were nautical and included, *inter alia,* attending to lines, displaying lights, putting out fenders, examining vessel for damage and leakage, and splicing lines); *Bailey v. Pilots' Asso. for Bay & River Delaware,* 406 F.Supp. 1302, 1307–08 (E.D.Pa.1976) (finding that the plaintiff was a FLSA-exempt "seaman" based on the plaintiff's work duties, which included operating a motor launch, keeping watch, and performing general deckhand chores); *Wade v. Gallagher Bros. Sand & Gravel Corp.,* No. 148–196, 1962 U.S. Dist. LEXIS 4174, at *1–*3 (S.D.N.Y. Oct. 4, 1962) (following *Martin,* in finding that the FLSA "seaman" exemption applied). Accordingly, the Court **FINDS** that the work Plaintiffs did for APS was seamen's work.

## C. Plaintiffs' Performed No Substantial Nonseamen's Work

█ Plaintiffs ask the Court to find that the time they spent waiting to perform seamen's duties constituted nonseamen's *work,* notwithstanding the undisputed fact that Plaintiffs spent such time sitting in their cars or trucks (or on a bucket), reading magazines, getting coffee, going to the gym, or doing other personal errands and activities. The Court refuses to accept such a strained interpretation. Plaintiffs cannot reasonably argue that their nonseamen's *work* exceeded the twenty (20) percent threshold of the 80:20 seaman's-to-nonseaman's-*work* ratio that the DOL's regulations suggest should guide a court's determination of whether the FLSA seaman's exemption applies. Plaintiffs had no nonseamen's *duties* and did not perform any nonseamen's *work.* The record is replete with Plaintiffs' assertions that they had no *duties* when waiting to answer calls for Moves with APS's boats,[13] and during

13. *See e.g.,* Doc. 22–2, McMahan Tr. at 98:2099:12 ("Q. Would you do any work when you worked—when the boat was docked at 5T [the Boathouse]? A. No, not really. Q. Would the deckhands do any work while the boat was docked at 5T? A. No. Q. Was there ever any work that was done other than when the boat was underway? A. Yes. Q. What work was done? A. Splicing lines. Q. Who would do the line splicing? A. Everybody chips in and does that."), at 101:24102:6 ("Q. Thanks. All right. So when the boat was at 5T or tied up is it correct then you could essentially do whatever you wanted; is that right? A. Yes, sir. Q. Was there any limit to the geographical area in which you could do whatever you wanted? I can ask it another way. How far could you go? A. I mean, I went home."); Doc. 22–3, Cooke Tr. at 8:1014 ("Q. And what does that job [working as a Captain for APS] involve? A. We are responsible for opening and closing the floating security gate at the Navy base? Q. Anything else? A. That's pretty much the job."), at 74:7–9 ("Q. Okay. Other than operate the boat, do you do any other work for APS? A. Not really."); Doc. 22–4, Rogers Tr. at 91:1 ("Q. What are your job duties when you're not working on the boat? A. We didn't have

any."); Doc. 22–5, Harrell Tr. at 65:9–19 ("Q. What would the deckhands do when the boat was there at 5T [the Boathouse]? A. If you were not underway, besides the morning checks, same as the captains, try to kill time. Q. Standing by for the next job; is that correct? A. Not necessarily. If they need to run to the bank or, you know, go get some food or sit in their vehicle and stay warm, that's fine. Q. But basically waiting for the next job; is that correct? A. Yes."); Doc. 22–6, Barranger Tr. at 38:1239:1 ("Q. And during the time that the boats were not actually underway what were—what were you doing? A. Sitting on a bucket. Q. Doing anything else? A. If we had new line sometimes we would cut them to length, put them on the boat. I mean, anything, clean the landing at the boathouse, try to stay warm, whichever the temperature was, you know. We were outside the whole day.... Q. So you mentioned sitting on a bucket. I'm assuming you mean waiting. Was there a reason you were sitting on a bucket? A. There was nothing other to do than just sit."); Doc. 22–7, Wiggins Tr. at 13:25 ("Q. Other than come in, fire up the boat, operate the boat and then stand by to go out on the boat, is there anything else you do at APS? A. No, sir."), at 63:7–15 ("Q. Is that

such waiting periods they performed no *work*.

Plaintiffs nonetheless maintain that they spent a vast percentage of their time doing activities, including those set forth in the parties' Stipulated Fact 6,[14] that were "certainly of a different character than work performed by seaman." Doc. 23. In reply to Plaintiffs' response to its motion for summary judgment, APS persuasively argues:

> Plaintiffs' position appears to be that, while conceding that their time spent working as seamen is exempt from overtime compensation provisions, the time they spent on standby waiting to do that overtime-exempt job is not exempt, because they are allowed to engage in personal activities, rest, and recreation or otherwise doing nothing during that waiting time. To even articulate the argument is to expose its frivolity.

Doc. 25 at 4.

When courts compare the ratio of seamen's *work* with nonseamen's *work* or *duties*, they are comparing one type of *work* and *duties* (seamen's) with another type of *work* and *duties* (nonseamen's). Such courts are not comparing seamen's *work* time with seamen's leisure time; such a ratio is not relevant to the inquiry. Plaintiffs' attempt to classify their leisure

[the Boathouse] where you go when you are not out on the boat? A. When I'm not out in the boat I sit in my truck, keep warm, go get lunch. I might have to run to the post office or just if I have a little task I need to get done that is what I do. Q. When you say a little task, you mean personal task? A. Yes, sir."), at 64:3–15 ("Q. You say you are paid to be there to stand by? A. Yes, sir, kind of. Q. To stand by to do that? A. Just wait for the jobs that I'm assigned to. Q. And what types of jobs are you talking about? A. To open up the PSBs. Q. In other words, to get on the boat to go out and operate the gate? A. Yes, sir. Q. Is there anything else that you do for APS? A. No, sir. Q. So that's all you do for APS? A. Yes, sir."); Doc. 22–8, Milton Tr. at 49:121 ("Q. All right Let's talk about the boathouse first. If you are not underway on the boat and you are working at the boathouse, what do you do? A. That's where we wash the boat at the end of the day. Q. What else do you do there? A. Maybe cut up a spool line once every other month. Q. What else do you do? ... A. Take the trash out Q. Okay, how often do you take out the trash? A. I do it once a week I would say. Q. How long does it take to take out the trash? A. About three minutes. Q. All right What else do you do? A. That's it."), at 51:414 ("Q. You mentioned tasks that you did at the boathouse. If you are not doing one of those tasks at the boathouse, what are you doing at the boathouse? A. Talking with the other guys, go to the store down the street, get coffee, get a magazine, sit in my truck and listen to the radio, music radio. Q. And you are getting paid for that?

A. Yes. Q. So what is your job? Why are you getting paid to do that? A. Because that is my job. Q. Your job is to be on standby for the boat, right? A. Yeah, depending on the— on what our schedule is like for the day."); Doc. 22–9, Brown Tr. at 26:3 ("Q. And when you're not doing one of these activities [performing Moves] what else were you doing? A. Eating, reading, taking a nap, working out. Sometimes—that's generally about it usually."), at 27:1316 ("Q. And you're doing no other work activities other than waiting? A. No other work activities other than waiting. That would be the only work activity, yes.").

14. Stipulated Fact 6 provides in full:

> While not underway on the Boats, and while not performing an activity as set out in Stipulated Fact 4 [splicing lines; going to the APS office, and sweeping and emptying the trash in and around the boathouse], the Plaintiffs could do the following things in the vicinity of the Boathouse: read magazines/books/newspapers, go on the internet, watch movies, sleep, sit in their vehicles, throw a football, and socialize. They were also routinely permitted to go to the store, work-out at the gym adjacent to the Boathouse, go to the exchange, go to the bank, and do similar personal errands, subject only to the constraint that they must remain in the vicinity of the Naval Base and be available for a call so that they could respond if needed to operate the Boats for an unscheduled Move.

Doc. 24 at 2.

activities as nonseamen's *work* is unavailing. A question of fact may exist as to the ratio of Plaintiffs' leisure activities as compared with their seamen's *work;* however, since the answer to this question is not relevant, its existence is not a bar to the granting of summary judgment.

As APS contends, in this case, Plaintiffs' leisure activities while waiting assume the character of the tasks that the Plaintiffs were waiting to perform—opening and closing the PSBs and performing other Moves with APS's Boats, i.e. Plaintiffs' seamen's *work. See Godard v. Alabama Pilot, Inc.,* 485 F.Supp.2d 1284, 1298 (S.D.Ala.2007) (classifying the time the plaintiff launch operators spent at their radio watch duties and standing by to ferry bar pilots to and from their boats as seamen's *work* because "[i]n awaiting instructions to launch their vessels, plaintiffs are acting as masters of their pilot boats"); *Martin v. McAllister Lighterage Line, Inc.,* 102 F.Supp. 41, 42–43 (S.D.N.Y.1951) (concluding that the plaintiffs were FLSA exempt seamen even though the plaintiffs spent most of their normal workdays sleeping, eating, or relaxing while to be called to their nautical duties).[15] The record fails to reflect Plaintiffs' substantial performance of any *work* that might gratuitously be deemed "nonseamen's" *work:* While employed with APS and not on Moves, Plaintiffs did little else but wait to do seamen's *work.* For these reasons, the Court **FINDS** that Plaintiffs had no nonseamen's *duties* and performed no substantial nonseamen's *work.*

## IV. CONCLUSION

In performing Moves on APS's Boats, Plaintiffs performed seamen's work. Plaintiffs performed no substantial nonsea-

---

**15.** In *Martin,* the District Judge reasoned:

> The plaintiffs argue, however, that these duties [the plaintiffs' seamen's duties] represent a minor part of the work they do, and that their principal duties were those of watchmen. Actually, I take it that their nautical duties on a normal day did not require more than an hour or two of physical effort except during towing. The rest of the time, apparently, they slept, ate, relaxed, read or busied themselves in any other fashion they liked until it was necessary to perform another nautical duty.
>
> . . .
>
> They are employed primarily to aid in the operation of the vessel and they do not do a substantial amount of nonexempt work.
>
> The Plaintiffs would persuade the Court that all nonphysical work, i.e. watching, is nonexempt work but I feel that their duties in their entirety relate to the operation of the vessel. They *"watched" only for a nautical assignment to arise.*

102 F.Supp. at 42–43 (emphasis added). *See also Adams v. United States,* 36 Fed.Cl. 91, 100 (Fed.Cl.1996) ("The court concludes that standby time should take on, for overtime pay purposes, the same character as 'actual' worktime, and in the same proportions."); *Smith v. Jackson,* 954 F.2d 296, 299 (5th Cir.1992) (deciding that district and battalion chiefs in the City of Jackson, Mississippi Fire Department were exempt from the FLSA's overtime provisions because they were executives or administrators under 29 U.S.C. § 213(a)(1), notwithstanding the fact that they spent the vast majority of their time waiting to respond to emergency dispatches, because "this waiting time assumes the character of the work the plaintiffs perform once dispatched to an emergency scene"); *Schmidt v. County of Prince William,* 929 F.2d 986, 990 (4th Cir.1991) (" 'Non-exempt work' is work which is distinct from and unrelated to 'fire protection activities.' 'Support activities,' on the other hand, are related to the task of fire protection. By carving out the exception to the 40–hour overtime requirements [in the FLSA], Congress recognized that the nature of a firefighter's job involves large amounts of time waiting to be dispatched."); *Paul v. Petroleum Equipment Tools Co.,* 708 F.2d 168, 174–75 (5th Cir.1983) (affirming, *inter alia,* a district court's finding that a pilot's time spent waiting to fly a plane was "necessarily incident" to the pilot's time flying and, therefore, exempt from the FLSA's overtime provisions along with the pilot's flight time pursuant to the 29 U.S.C. § 213(a)(1) exemption of employees employed in a professional capacity).

men's work in addition to their seamen's work. Accordingly, the Court **GRANTS** APS's motion for summary judgment that Plaintiffs' claims for overtime pay are expressly barred by 29 U.S.C. § 213(b)(6), which exempts from the FLSA's overtime pay requirements "any employee employed as a seaman." Having so ruled, the Court **DISMISSES AS MOOT** APS's motion for leave to file supplemental exhibits to its reply memorandum. Doc. 23.

The Clerk is **REQUESTED** to send a copy of this Order to all counsel of record.

It is so **ORDERED.**